**In re PLYWOOD ANTI–TRUST LITIGATION.**

**M.D.L. 159.**

United States District Court,
E. D. Louisiana.

March 15, 1976.

Gene W. Lafitte, Liskow & Lewis, Charles W. Lane, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Charles K. Reasonover, Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

Herbert J. Garon, Garon, Brener & McNelly, New Orleans, La., for plaintiff.

## MEMORANDUM OPINION AND ORDERS RE CLASS ACTION ISSUES

CASSIBRY, District Judge.

This litigation consists of seventeen antitrust actions either instituted in this district or transferred here for pretrial proceedings by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. Section 1407. *See In re Plywood Antitrust Litigation,* 376 F.Supp. 1405 (Jud.Pan.Mult.Lit.1974). Each of the actions is brought by purchasers of softwood plywood against certain plywood manufacturers under Section 1 of the Sherman Act.

Presently before the Court are the motions of the named plaintiffs in several of these actions for the certification of various classes under the provisions of Rule 23, F.R.Civ.P. Extensive factual and legal material has been submitted by the parties and oral argument on the motions was held in New Orleans on May 22, 1975. Pursuant to Rule 23(c)(1), F.R.Civ.P., this Court is required to make the instant determinations "as soon as practicable after the commencement of an action brought as a class action." Accordingly, we proceed to examine the motions presently before us.

### BACKGROUND OF THE MOTIONS

The initial motions for class action certification were generally filed by two different groups of plaintiffs. The plaintiffs' groups were aligned according to the geographic description of the purported classes of plaintiffs and the number and nature of the defendants named in the respective actions. The two plaintiff groups differed as to both the definition of the suggested class of plaintiffs and the suggested class of defendants to be certified.

Plaintiffs in the "Major Producer Cases" sought the certification of several plaintiff classes of plywood purchasers located East of the Rocky Mountains while plaintiffs in the "Industry Wide Cases" sought the maintenance of several nationwide plaintiff classes of plywood purchasers. The denomination of these groups of actions as either "major producer" cases or "industry wide" cases results from the inclusion of the seven major plywood producers only [1] as defendants in the "major producer" cases while numerous Southern only and Western only plywood producers are named as additional defendants in the "industry wide" cases.

Following our request for supplementary briefs on certain class action issues, plain-

---

1. The seven major plywood producers named as defendants in all actions are Boise Cascade Corporation, Champion International Corporation, Georgia-Pacific Corporation, International Paper Company, Vancouver Plywood Co., Inc., Weyerhauser Company and Williamette Industries, Inc.

tiffs in all active actions in this litigation [2] joined in seeking the certification of certain groups of actions as class actions on behalf of five nationwide plaintiff classes, with each such group of actions to proceed against the "industry wide" defendants irrespective of whether all defendants had originally been named in a particular action. These five plaintiff classes, plaintiffs maintain, are based upon traditionally recognized commercial functions: dealer, subcontractor, general contractor, builder-owner, and manufacturer. The procedural flaws in plaintiffs' proposed cross-action inclusion of defendants will be commented on in the "manageability" portion of this opinion.

## PLYWOOD HISTORY AND PRICING

Softwood plywood is produced from the timber of coniferous trees generally termed evergreens.[3] Prior to 1964, softwood plywood was made almost exclusively from Douglas Fir and other species located in the Western portion of the nation and particularly the Pacific Northwest.[4] Production facilities were consequently located predominantly in that area.

As a result of the advent of new laminating techniques permitting the increased utilization of Southern Pine in the production of softwood, plywood mills for its manufacture were established in the Southern Region of the country beginning in 1963.[5] Some manufacturers of plywood previously located only in the West opened Southern mills and timber processors in the South entered the softwood plywood field.

Typically, direct mill sales of softwood plywood are priced either on an "f.o.b. mill"

or on a "delivered price" basis, with delivered prices predominating.[6] The delivered price of plywood is the total amount paid by the purchaser for the product delivered to his place of business. An f.o.b. mill price is the cost of the plywood to the purchaser at the manufacturing or distribution point with the customer arranging and paying for his own delivery.[7] Theoretically, the difference between a delivered price and an f.o.b. mill price for a particular plywood shipment should be attributable to the freight component of the delivered price.

Segregation of the actual freight component of the delivered price may be difficult for the buyer to achieve. This results from the manner in which freight charges are billed by the manufacturer. Most plywood sold on a delivered price basis is billed as "freight prepaid." The customers' invoice for the plywood sold on this basis reflects only the final full delivered price and does not separately list the actual freight element of that price.[8] Plywood purchasers are not as interested in actually allocating the portion of the delivered price they pay to freight charges as they are to purchasing plywood at the lowest possible delivered price, whether they provide their own transportation or whether the seller does.

The plywood manufacturer-seller is, however, acutely interested in determining the actual freight charge for plywood sold on a delivered price, freight prepaid basis since it facilitates computation of his "mill net return." The manufacturers' mill net return is defined as the delivered price less actual freight cost.[9] The higher the manufacturer-seller's mill net return, the higher his potential profit.

2. Plaintiffs in 75–224 (*Kit*) have filed a motion for voluntary dismissal of their action and accordingly, did *not join in the agreement* reached among the other plaintiffs.

3. Rinfert Boston Associates, Inc., *Prices and Production, An economic analysis of Softwood Lumber and Plywood, 1970–1973,* p. 1.

4. Indeed, before then more than 99% of all softwood plywood was produced in the West. *Id.* at pp. 11–13.

5. By 1972, the Southern mills had increased their share of the plywood market to 29%. *Id.* at p. 13.

6. Affidavit of Roy Weinstein, Vol. I, p. 17. Annex B. to Memorandum filed on behalf of the bulk of the defendants by Kirkland & Ellis.

7. *Id.* at p. 12.

8. *Id.* at p. 19.

9. *Id.* at p. 18.

When plywood sales originated almost exclusively from mills located in the Pacific Northwest, manufacturers could easily calculate their mill net returns on delivered priced plywood. The actual freight rate to be subtracted from the delivered price to arrive at the mill net figure was computed by determining the distance from Portland to the location which the purchaser had chosen as his delivery point and applying the appropriate freight rate for that distance accounting, of course, for the weight of the wood.[10]

Once the Southern mills came into existence and shipments of plywood originated from them, the determination of mill net returns on delivered priced sales had to be made by subtracting actual freight from the various Southern points of origin rather than the traditional Pacific Northwestern location. The advent of the Southern mills, therefore, provided plywood manufacturers an opportunity, the exercise of which is in dispute, to increase their mill net returns on sales originating from those mills by failing to reduce their delivered prices to reflect the decrease in actual freight cost achieved because of the origination of the plywood at locations closer to purchasers' selected destinations.

The failure of the plywood manufacturers to reduce their delivered prices on sales originating from Southern mills to reflect savings in freight charges could additionally have increased or stabilized the price of plywood originating from Western mills. This conclusion is supported by the following statement in the Affidavit of Roy Weinstein, an expert economist whose findings were offered by defendants:

> "Although the allegations in this regard would appear to relate primarily to sales of plywood produced in the South, Western and Southern plywood are sold into many common markets. To the extent that these products are fungible, it would be impossible to 'stabilize' the price of one without stabilizing the price of the other." [11]

Thus if, as plaintiffs maintain, defendants conspiratorially kept the delivered price of plywood originating from Southern mills artificially high, this could have the correlative effect of increasing or stabilizing prices and mill net returns on sales from Western mills.

It should be noted that the failure of all Southern plywood manufacturers to reduce their delivered prices on sales originating from Southern mills and the corresponding increase or stabilization of prices on sales from Western mills would not necessarily have resulted in a uniformity of delivered prices and mill net returns. It would only have resulted in inflated or stabilized delivered prices and mill net returns.

It may be helpful at this point to relate the foregoing exposition to the terminology used by the parties in order to arrive at an appropriate characterization of these actions. Plaintiffs maintain that the various defendant plywood manufacturers have conspiratorially adopted a single basing point system for computing their delivered prices. This allegation is merely a shorthand description for the defendants' alleged concerted maintenance of the traditional Pacific Northwest location for determining the freight component of the delivered price notwithstanding the origination of certain plywood sales from Southern mills.

Plaintiffs contend that defendants' conspiratorial failure to adjust delivered prices to reflect the actual point of origin of a particular plywood shipment has resulted in the payment of substantial unearned "phantom freight" to defendants. The use of the term "phantom freight" is another way of describing the increased mill net return to the defendant manufacturers and higher or stabilized price of plywood as a result of the alleged conspiracy.

The terms single basing point system and phantom freight are not dispositive of the nature of these actions but serve only to summarize the means and effects of the alleged illegal agreements posited by plaintiffs.

---

**10.** *See id.* at p. 21.

**11.** *Id.* at p. 27 note 16.

## NATURE OF THE ACTIONS

■ Plaintiffs allege, inter alia, that the defendant plywood manufacturers have:

"established and maintained a system of delivered prices based on computation of rail freight from the Pacific Northwest for shipment made from mills located outside that region." [12]

The gravamen of plaintiffs' Section 1, Sherman Act claims is that the adoption of the single basing point system by all defendants was the result of an illegal combination and conspiracy whose purpose was to increase or stabilize prices and eliminate price competition in the manufacture, distribution and sale of softwood plywood.[13] The concerted use of the single basing point system is only the means by which the increase or stabilization of prices and mill net returns is alleged to have occurred.

Plaintiffs additionally allege that in furtherance of their conspiracy defendants have:

"established and maintained a system of delivered prices based on computation of rail freight and applied it to shipments made by other and cheaper modes of transportation;

"refused to permit customers who purchase from southern plants the option of picking up purchases at true f.o.b. mill prices;

"used identical and inaccurate estimated weights as the basis for quoting delivered prices." [14]

Each of these allegations also relates to an alleged conspiratorial attempt by defendants to stabilize or increase prices and their mill net returns. The estimated weights allegation, arises from the fact that most direct mill sales of softwood plywood are negotiated prior to the actual weighing of the wood which necessitates the use of some system to convert the ordered length of plywood into the appropriate poundage. The estimated weights allegation, when dis-

sected, is that as part of the alleged conspiracy defendants agreed to utilize identical and erroneous conversion tables.

All of the complaint allegations mentioned above concern the alleged conspiratorial increase or stabilization of prices for plywood and defendants' mill net returns. If such a conspiracy be proved, then a violation of Section 1 of the Sherman Act will have been demonstrated. *See e.g. United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

With the focus of the actions thus centered much of the confusion and disagreement between the parties can be avoided. Plaintiffs have argued that they are attacking a conspiracy only with the use of the single basing point system as one of the means used by that conspiracy. Defendants, on the other hand, maintained that plaintiffs were directly attacking the basing point system resulting in antagonistic interests among the members of each of the purported classes. These antagonistic interests result, according to defendants, from the fact some plywood purchasers pay only the true actual freight cost under the basing point system as posited while others pay "phantom freight".

As discussed earlier, however, the use of terms such as basing point system and phantom freight are not dispositive of the nature of these actions. When boiled down to its essential ingredient, plaintiffs allege a horizontal price fixing conspiracy among the defendants. This conspiratorial price fixing has allegedly stabilized and increased plywood prices and defendants' mill returns. Instead of focusing exclusively on the manner in which the alleged system operated to damage plaintiffs, it is our view that the inquiry should also be directed as to how the alleged system would operate to illegally benefit the defendants, if the conspiracy, as alleged, did indeed exist.

12. *See e.g.* Par. 18, *West Deer Park* Complaint.

13. *See e.g., id.* at Pars. 19, 20.

14. *See e.g. id.* at Par. 20. It should be noted that the complaints in several of the industry

wide cases originally included Robinson-Patman Act claims. Those claims have, at least for present purposes, been abandoned and there is no request for class certification of any Robinson-Patman Act allegations.

As noted earlier, by the admission of defendants' own economist,[15] it would be impossible for defendants to have increased or stabilized the price of plywood shipped from Southern mills without affecting the price of plywood shipped from Western mills. Accordingly, if plaintiffs succeed in proving their allegations, the harmful effects of the conspiracy would not solely be to purchasers of plywood from Southern mills because of the fungibility of plywood and the many common markets into which Western and Southern plywood are sold.

That impact would not necessarily be limited to East of the Rockies purchasers who were closer to Southern than to Western mills. The injury potentially would have a nationwide effect. Thus we must reject the original plaintiffs' class limitations based on purchasers' geographic location advanced by plaintiffs in the "major producer" cases. Moreover, such a conclusion also compels us to reject defendants' contention that the fundamental nature of these actions is directed to discriminatory treatment among various plywood purchasers with only certain purchasers as possible victims of the illegal system alleged by plaintiffs. In our view, plaintiffs in the "industry wide" cases have properly alleged a price fixing conspiracy whose effect might be nationwide in scope.

Our analysis has thus far primarily concerned the sale of plywood directly from the manufacturer or his agent to the plywood customer. Each of the purported classes contains such direct purchasers. The plaintiff classes proposed, however, contain indirect plywood purchasers as well. These indirect purchasers buy their plywood from someone other than the manufacturer or his agent, such as a plywood wholesaler.

Although we are not yet called upon to decide whether indirect plywood purchasers have standing to maintain these actions against the defendants, it seems appropriate to note that each of the classes asserted appears to be comprised, at least in so far as they consist of indirect purchasers, of *final* consumers of plywood as opposed to *ultimate* consumers of plywood. *See State of Illinois v. Ampress Brick Company, Inc.,* 67 F.R.D. 457 (N.D.Ill.1975). Both the direct purchasers in each of the purported classes and the indirect, final consumers acquired their plywood in the same condition as originally manufactured and sold by the defendants. Accordingly, inclusion of both direct and indirect purchasers in each of these classes is not fatal, at this time, to preclude consideration of the propriety of the maintenance of any classes so composed. It may be that on further refinement of the issues and subsequent factual development, the Court may be required to eliminate some class members in any classes certified. At this stage, however, we proceed to examine whether the requirements of Rule 23 have been met with respect to each of the proposed classes.

## RULE 23 ANALYSIS

■ In order for an action to be maintained as a class action under Rule 23, F.R. Civ.P., each of the requirements of Rule 23(a) must be satisfied as to each of the purported classes and, in addition, one of the three conditions of Rule 23(b) must be met by all proposed classes. Although plaintiffs have attempted to hinge their requests for class certifications on Rules 23(b)(1) and (b)(2), as well as Rule 23(b)(3), the classes herein asserted can be maintained, if at all, under Rule 23(b)(3) only. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 564 (2nd Cir. 1968); *Bogosian v. Gulf Oil Corp.,* 62 F.R.D. 124, 132–134 (E.D.Pa.1973); *Ungar v. Dunkin'Donuts of America,* 68 F.R.D. 65 (E.D.Pa.1975); 3B Moore's Federal Practice, ¶ 23.45[1] at p. 23–708 n. 43. This result follows from our conclusion that even though plaintiffs have requested equitable relief, the claims for such relief are merely incidental to the predominant focus of the actions, treble damages.

■ Plaintiffs have the burden of establishing that each of the requirements of Rule 23(a) and Rule 23(b)(3) have been satisfied as to each of the proposed classes.

---

**15.** *See* note 11, *supra.* Weinstein Affidavit at·p. 27 note 16.

*Albertson's Inc. v. Amalgamated Sugar Company,* 62 F.R.D. 43, 49 (D.Utah 1973), *aff'd* 503 F.2d 459 (10th Cir. 1974); *Philadelphia Electric Company v. Anaconda American Brass Co.,* 43 F.R.D. 452, 457 (E.D.Pa.1968); *Green v. Wolf,* 406 F.2d 291, 298 (2nd Cir. 1968), *cert. denied* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

Before proceeding to an analysis of the propriety of the maintenance of the purported classes under Rule 23, F.R.Civ.P., it is important to delimit the permissible scope of our inquiry. In *Eisen IV, Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the Supreme Court plainly indicated that resolution of Rule 23 motions should not involve an inquiry into the ultimate merits of an action. As the Court stated:

"We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. . . ."

417 U.S. at 177, 94 S.Ct. at 2152; *Accord Miller v. Mackey International,* 452 F.2d 424, 427 (5th Cir. 1971).

The District Court in *Eisen* had conducted a preliminary inquiry into the merits of the action for the purpose of determining the proper proportion of the costs of notice to absent class members to be borne by plaintiff and defendants, respectively. In sustaining the Second Circuit's reversal of that procedure, the Supreme Court did not limit its proscription of minihearings on the merits when they involved solely the allocation of the costs of notice. Rather, the Court stated that an evaluation of whether plaintiff or defendant is likely to prevail at the ultimate trial on the merits is an impermissible area of inquiry when resolving class action motions.

This does not mean, however, that the issues on the merits are completely irrelevant to class determinations. "An analysis of the issues and the nature of proof which will be required at trial is directly relevant to a determination of whether the matters in dispute are principally individual in na-

ture or are susceptible to proof equally applicable to all class members. *E.g. Denver v. American Oil Co.,* 53 F.R.D. 620 (D.Colo. 1971)." *Abercromie v. Lum's Inc.,* 345 F.Supp. 387, 390 (S.D.Fla.1972); *See also Bogosian v. Gulf Oil, supra,* 62 F.R.D. at 131; *Albertson's Inc. v. Amalgamated Sugar Company, supra,* 62 F.R.D. at 48.

## RULE 23(a)(1)

■ Rule 23(a)(1) requires a finding that "the class is so numerous that joinder of all members is impracticable." None of the defendants has disputed the numerosity of any of the purported classes nor have they argued that joinder of the absent class members would be practicable. The evidence indicates that each of the proposed classes consists of thousands of persons, the exact number being unknown at this time. The absence of figures showing the exact total number of class members in each of the classes is not fatal to a showing of numerosity under Rule 23(a)(1). *Albertson's, Inc. v. Amalgamated Sugar Company, supra,* 62 F.R.D. at 52. In our view, joinder of these thousands of class members in each of the proposed classes would be impracticable and accordingly, we find that the requirements of Rule 23(a)(1) have been satisfied as to each.

## RULE 23(a)(2)

■ In order to satisfy Rule 23(a)(2), plaintiffs in each of the proposed classes must show that "there are questions of law or fact common to the class." This requirement should be distinguished from the requirement of Rule 23(b)(3) where such common questions must be shown to "predominate" over questions affecting only individual class members. The minimal requirement of commonality under Rule 23(a)(2) has been characterized as superfluous in purported Rule 23(b)(3) actions. *See* 3B Moore's Federal Practice, ¶ 23.06–1 at p. 23–301. In any event, it seems clear that common questions of fact exist with respect to all members in each of the proposed classes.

The primary common questions of fact relate to the proof which must be offered by plaintiffs in each of the proposed classes that defendants conspired to increase or stabilize the price of plywood and their mill net returns through the utilization of a single basing system, the maintenance of delivered prices based on computation of rail freight rates for shipments made by other cheaper modes of transportation, the refusal to permit pickup from Southern mills at true f.o.b. mill prices, and the use of identical and inaccurate estimated weights as the basis for quoting delivered prices.

Since these questions are common to the members of each of the purported classes, the requirement of Rule 23(a)(2) has been satisfied as to each.

### RULE 23(a)(3)

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality requirement of Rule 23(a)(3), however, closely parallels the adequacy inquiry under Rule 23(a)(4) and accordingly, will be discussed under that heading. *See, e.g. Ungar v. Dunkin'Donuts of America, supra.*

### RULE 23(a)(4)

■ An action is maintainable as a class action under Rule (a)(4) if "the representative parties will fairly and adequately protect the interests of the class." The adequacy of representation requirement of Rule 23(a)(4) depends on several factors:

"(a) the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to the class."

*Ungar v. Dunkin'Donuts of America, supra,* 68 F.R.D. at p. 136; *See also Windham v. American Brands, Inc.,* 68 F.R.D. 641 (D.S. C.1975). In addition, the adequacy inquiry requires a finding that the representative party and his attorney can be expected to prosecute the action vigorously. *Id.*

The requirement of typicality under Rule 23(a)(3) has similarly been interpreted to mean that the claims of the representative parties cannot be antagonistic to the claims of the other class members. *See, e.g., Thomas v. Clarke,* 54 F.R.D. 245 (D.Minn. 1971).

■ In their joint response to our request for supplementary briefs on certain class action issues, plaintiffs in all active actions in this litigation have designated the counsel whom they seek to have represent the various classes they propose. Although we disagree with the proposed consolidated class actions and the cross action inclusion of various defendants, we will not, nor have defendants, challenged the qualifications, experience or ability of any of the proposed class counsel. Indeed, many of the attorneys designated by plaintiffs as class counsel have been involved in some of the most significant and difficult class action litigations in recent years. We find that all such proposed counsel are sufficiently skilled to carry on this litigation. *See Dolgow v. Anderson,* 43 F.R.D. 472, 496 (E.D.N.Y. 1968), *summary judgment rev'd,* 438 F.2d 825 (2nd Cir. 1970). And, like Judge Becker in *Dunkin'Donuts,* we believe that the possibility of recovering attorney's fees is sufficient stimulus so that the various representative parties and their attorneys can be expected to prosecute this litigation vigorously. We will make the class counsel designations in a later portion of this opinion.

Before proceeding to discuss defendants' primary arguments on the adequacy and typicality issues, it should be mentioned that defendant International Paper Company has argued that John J. O'Shea, Trustee in Bankruptcy of Diamond Lumber Co. and plaintiff in 74–1642, would be an inadequate class representative because his status as trustee precludes him from forcefully and effectively representing absent class members. *O'Shea* was brought on behalf of certain plywood purchasers located East of the Rocky Mountains. Since we will not certify any of the actions originally brought on behalf of East of the Rockies purchasers, there is no need to resolve the questions raised by International Paper's objection to O'Shea as a representative party.

The thrust of defendants' arguments on the adequacy and typicality issues is that there are inherent and irreconcilable conflicts of interest among the members of each of the proposed classes. These conflicts, according to defendants, arise from (1) the basing point allegations; (2) the estimated weights allegations; and, (3) the presence of direct and indirect purchasers in each of the purported classes.

## (1) BASING POINT ALLEGATIONS

Defendants argue that a basing point system must inherently involve discriminatory prices between favored and disfavored purchasers. The disfavored purchasers, defendants maintain, would be those purchasers located closer to the Southern than to the Western mills who are required to pay higher than actual freight cost for their plywood purchased on a delivered price basis. Since plaintiffs seek to end the base point pricing system, defendants contend, the conflicts between favored and disfavored purchasers preclude class treatment.

Defendants rely heavily on *Albertson's Inc. v. Amalgamated Sugar Company, supra,* in support of their position that conflicts between favored and disfavored purchasers precludes class designations. The defendants in that case were manufacturers of beet sugar who had established their plants in the Northwest region of the country close to the source of their raw materials. Since beet and cane sugar are fungible commodities, no sugar purchaser is willing to pay even a few pennies more for beet sugar. Realizing that they could profitably market their product only by meeting the prevailing price of cane sugar, defendants established their delivered prices by adopting the base price for cane sugar used by C & H at its plant near San Francisco plus the common carrier charges from that point. 62 F.R.D. at 47. Purchasers closer to defendants' plants than to the C & H plant would, therefore, pay higher than actual freight charges for beet sugar sold on a delivered price basis. This differential in the "prepay," Plaintiffs maintained, resulted in the accrual of unearned phantom freight to defendants. 62 F.R.D. at 48.

Plaintiffs in *Albertson's* seeking to represent a class of all beet sugar purchasers for resale in the complaint area, alleged four separate causes of action; First, that defendants had conspired to fix prices in violation of Section 1 of the Sherman Act; Second, that defendants had illegally monopolized the beet sugar industry in violation of Section 2 of Sherman; Third, that defendants had utilized illegal tying arrangements in violation of Section 1 and Fourth, that defendants had violated the Robinson-Patman Act.

The *Albertson's* court denied class certification on the tying and Robinson-Patman Act claims. The court noted that the major issue posed by the tying claim was whether the delivered price paid by the plaintiffs was equivalent to the sale of one product, the sugar, upon condition or tied to the purchase of another service, namely, freight to the customer. 62 F.R.D. at 52. Since each and every contract for the sale of beet sugar was thereby being contested as violative of Section 1 of the Sherman Act, the court reasoned, plaintiffs in their tying claim were directly attempting to end base point pricing. The court concluded that there were differing interests among the potential class members in the continued existence of the base point pricing system which resulted in antagonistic positions within the proposed class and therefore held that the requirements of Rule 23(a)(4) had not been met. The court observed:

"In view of the potentially varying impact on each individual sugar buyer and, consequently, their differing positions with respect to base point pricing, we feel that the named plaintiffs could not adequately represent the whole class." 62 F.R.D. at 54.

The court in Albertson's similarly denied class certification on the Robinson-Patman Act claims. It held:

"By the Robinson-Patman count, base point pricing itself is under attack and, if the plaintiffs are successful, we would have to permanently enjoin the use of a basing point system. Again, because of

the conflicting interests among the class members involved in such a ruling, those seeking to represent the class cannot do so adequately." 62 F.R.D. at 55.

In our view, defendants' reliance on *Albertson's* is misplaced in light of the essential factual differences between that case and the actions presently before us. In *Albertson's* plaintiffs alleged that the delivered price of beet sugar to a particular purchaser would always be the same defendants allegedly agreed to charge both the C & H base price *and* the common carrier charges from the C & H plant to the purchaser's selected destination. Therefore, the basing point system involved in *Albertson's* allegedly determined the precise final price a beet sugar purchaser would have to pay for a particular delivered price purchase regardless of which defendant was the seller. In the event that this manner of determining uniform delivered prices was outlawed, as the court construed the requests for relief in the tying and Robinson-Patman Act claims, "some new basis price would have to be set which would maintain the percentage return on capital constant with existing levels if the defendants are to stay in business." 62 F.R.D. at 53. Regardless of the new base price which would be charged by the beet sugar manufacturers in *Albertson's*, the court concluded that termination of the system would alter competitive positions within the proposed class. *Id* Thus, it held that antagonistic interests precluded certification of the tying and Robinson-Patman Act claims.

■ In the instant litigation, there is no claim that the plywood manufacturer-defendants charged a uniform delivered price to a particular purchaser. The allegations relate to stabilization or increase of plywood prices and of mill returns by defendants through an illegal conspiracy. There is no contention that defendants added a uniform freight charge to a uniform base price to arrive at their delivered prices. Thus, unlike the *Albertson's* situation, we find no necessary alteration in competitive relationships among the members of each of the purported classes should we certify certain actions as class actions.

■ Moreover, even assuming such conflicts might exist were we confronted with tying and Robinson-Patman Act claims, we would nonetheless, as the court in *Albertson's* did, certify the conspiracy claims before us. The elimination of an alleged conspiratorial increase or stabilization of prices and defendants' mill net returns is the common goal of the members of each of the purported classes since, such a conspiracy, if it exists, necessarily results in artificially manipulated prices. The fact some class members are benefitted more than others does not thereby result in antagonistic interests within each of the classes which precludes class certification. *See Jacobi v. Bache & Co., Inc.* 1972 Trade Cases, Par. 73,980 at p. 92,091 (S.D.N.Y.1972); *See also Windham v. American Brands, Inc., supra,* 68 F.R.D. 641.

## (2) ESTIMATED WEIGHT ALLEGATIONS

■ Plaintiffs, in substance, have alleged that defendants conspiratorially used identical and inaccurate estimated weights as the basis for quoting delivered prices. Defendants maintain that the use of estimated weights resulted in a benefit to certain purchasers when the actual weight of the wood at the time of shipment exceeded the estimated weight upon which the freight charge was determined. They argue that those purchasers who received a benefit from the use of estimated weights have conflicting interests with those purchasers who were hurt by the use of estimated weights. Thus, they contend, the inherent conflict between these different purchasers results in an antagonism of interests and destroys the requisite adequacy of representation under Rule 23(a)(4).

In our view, defendants' arguments on this point go to the merits of plaintiffs' claim that defendants conspiratorially increased or stabilized prices or their mill returns through the estimated weights device. Moreover, the benefit or detriment to particular class members as a result of the

use of estimated weights goes to the amount of damages, if any, suffered by them. There is no antagonism within any of the classes with respect to proving that defendants did indeed illegally conspire to utilize erroneous estimated weight tables. Accordingly, we again reject this aspect of defendants' contentions.

### (3) DIRECT–INDIRECT PURCHASER ISSUE

■ Defendants contend that the presence of both direct and indirect purchasers in each of the purported classes gives rise to conflicts of interest under Rule 23(a)(4). They argue that since only one recovery may be obtained for any one purchase, class members who buy indirectly must show that any illegal overcharge was passed on to them. Since any recovery by an indirect purchaser divests the direct purchaser to that extent from any right to recover, they maintain, the interests of direct and indirect purchasers are adverse.

Defendants rely primarily on a series of cases wherein, they contend, the presence of both direct and indirect purchasers within the same class was held to give rise to individual questions which predominated over any common questions of law or fact. *See, e. g., Ohio v. Richter Concrete Co.*, 69 F.R.D. 604 (S.D.Ohio 1975); *Denver v. American Oil Co.*, 53 F.R.D. 620 (D.Colo. 1971); *Bill Minelli Cement Contracting, Inc. v. Richter Concrete Corp.*, 62 F.R.D. 381 (S.D.Ohio 1973). We will, of course, reach the issue of predominance in a later portion of this opinion. Suffice it to say at this time, that none of the cases cited by defendants stand for the proposition that the presence of direct and indirect purchasers in the same class *a fortiori* results in an antagonism of interests making the representation of absent class members inadequate under Rule 23(a)(4).

The members of each of the purported classes, be they direct or indirect purchasers of plywood, all have the same interest in establishing the existence of the illegal conspiracy alleged in the complaints. Although the amount of an indirect purchas-er's recovery may depend on how much of any illegal overcharge was passed on to him by the direct purchasers, *See In re Western Liquid Asphalt Cases*, 487 F.2d 191, 201 (9th Cir. 1973), both the direct and indirect purchasers have common interests in establishing facts giving rise to a right to recover any damages on either of their parts.

Thus, if any conflict between direct and indirect purchasers exists, it exists solely on the question of damages and not on the liability issues. Since we intend to certify the liability issues only as class issues, the presence of direct and indirect purchasers in each of the classes does not give rise to a conflict of interest which would render the representation of absent class members inadequate.

### RULE 23(b)(3)

A class action may be maintained under Rule 23(b)(3) if:

"the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Rule 23(b)(3) lists several factors which are pertinent to the findings of predominance and superiority. They include:

"(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

### (1) PREDOMINANCE OF COMMON QUESTIONS

■ In our discussion of the requirements of Rule 23(a)(2), we have mentioned the common questions of fact which exist among the members of each of the purport-

ed plaintiffs classes. In order to determine whether these common questions predominate, however, more is required than a mere consideration of commonality. The determination of predominance requires close consideration of the separate questions of law or fact which may determine the ultimate issues. *In re Transit Co. Tire Antitrust Litigation,* 1975 Trade Cases, Par. 60,144 at pp. 65,408; 65,418.

Defendants argue that certain individual issues overshadow any common questions of fact or law and hence, negate the requisite predominance. These asserted individual issues are: (A) the individual liability issues —(1) fact of injury and (2) direct-indirect purchaser issues; (B) individual amount of damage issues; and (C) the individual fraudulent concealment issues.

### (A)(1): *Individual Liability—Fact of Injury*

Defendants argue that Section 4 of the Clayton Act, 15 U.S.C. Section 15, permits monetary recovery for violation of the antitrust laws only to "any person who shall be *injured* in his business or property." (emphasis supplied). Hence, they maintain, each individual class member will have to establish the fact of his own injury before any defendant will be liable to him. Accordingly, defendants contend, this individual inquiry destroys the commonality of proof among the various class members and thus negates the required predominance.

Defendants rely heavily on *Shumate & Co., Inc. v. National Association of Securities Dealers, Inc.,* 509 F.2d 147 (5th. Cir. 1975). In *Shumate,* the District Court denied class certification on account of its conclusion that the controlling question as to liability was whether a class member had suffered injury thus destroying the required predominance of common factual questions. 509 F.2d at 155. Since proof of injury to business or property of each class member was critical to the determination of defendants' liability to any class member, the Court of Appeals held, the District Court was within its discretion in deciding that common questions did not predominate. *Id.*

In another portion of its opinion in *Shumate,* the Court of Appeals clarified its interpretation of the requirement of proof of the fact of injury. Proof of the fact of injury requires that plaintiff come forward with evidence of a "causal relationship" between defendants' alleged illegal activities and the resultant harm suffered by plaintiff. 509 F.2d at 153. Since Shumate had failed to introduce such evidence, the requisite fact of injury had not been established as to him individually and hence, the Court of appeals held, the District Court had been justified in entering a directed verdict against Shumate. *Id.* at 153–155.

Thus, the denial of class action status in *Shumate* was predicated on the District Court's necessary conclusion that since each class member would have to demonstrate a causal relationship between defendants' activities and the harm he suffered, common factual questions on the conspiracy issue did not predominate. Therefore, the proper inquiry is whether in the circumstances of this particular litigation proof of a causal nexus between defendants' alleged illegal conspiracy and the harm suffered by the individual class members in each class would necessitate individual factual determinations.

We conclude that such individual factual determinations would be unnecessary in the circumstances of these particular actions. Judge Blumenfeld, in *In re Master Key Antitrust Litigation,* 70 F.R.D. 23 (D.Conn.1975), recently commented on the argument that class treatment was necessarily destroyed by the requirement of proof of the fact of injury for each individual class member. He observed:

"I believe this classic defense argument . . . to be a red herring, notwithstanding its acceptance by some courts . . . If the plaintiffs introduce proof (or if it may be stipulated) at the liability stage that they bought master key systems and that the defendants engaged in a pervasive nationwide course of action that had the effect of stabilizing prices at supracompetitive levels, the jury may conclude that the defendants' conduct

caused injury to each plaintiff. The amount of that injury may be computed at a separate trial on the damage issues." 70 F.R.D., p. 26 note 3.

Thus, the causal relationship demanded by *Shumate* in order to demonstrate the fact of injury can be satisfied by a showing of sufficient relevant evidence to permit the trier of fact, at the liability stage, to *conclude* its existence without the necessity of proof by each individual class member of the immediate consequences of defendants' activities upon him. The amount of a particular class member's damages cannot, or course, be determined by such a showing but this question is properly reserved to the damage phase of the proceedings.

 Applying these principles to the actions before us, if the members of each of the classes prove they purchased softwood plywood during the relevant period and that defendants conspiratorially increased or stabilized plywood prices, then the trier of fact may conclude that the requisite fact of injury occurred. Therefore, the fact of injury issues do not give rise to a host of individual questions which destroys the requisite predominance of questions common to the classes.

(A)(2): *Individual Liability—Direct-Indirect Purchaser*

 Defendants argue that the presence of both direct and indirect plywood purchasers in each of the purported classes gives rise to a host of individual issues which defeats the required predominance of common factual or legal questions under Rule 23(b)(3). They maintain that each of the indirect purchasers in each of the classes would have to demonstrate that any illegal overcharge was passed on to them by their direct purchaser-seller before the liability of any defendant to that particular plaintiff was established. Hence, they contend, an inquiry into these individual issues would be necessary and accordingly, that the required predominance is absent.

Defendants, in this aspect of their argument, seek to apply *Hanover Shoe, Inc. v. United Shoe Machinery*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), in a manner which, in our view, is totally inconsistent with its basic principles. In that case, the defendant machinery manufacturer argued that the plaintiff shoe manufacturer had passed any illegal overcharge on to its own customers, thereby sustaining no loss. The Supreme Court rejected the availability of this pass on defense, except in certain limited cost-plus circumstances, to an antitrust violator as against his direct customer. *See State of Illinois v. Ampress Brick Company, Inc., supra.* Defendants would have us construe the rejection of this defense by the Supreme Court as equivalent to a pronouncement that we should refuse to entertain class actions where each of the classes are composed of both direct and indirect purchasers since the indirect purchasers would have to prove the amount of the overcharge passed on to them in order to recover damages.

The Supreme Court in *Hanover Shoe,* however, was not called upon to decide whether and to what extent indirect purchasers from an antitrust violator would be permitted to maintain actions under the antitrust laws. *See Boshes v. General Motors Corp.*, 59 F.R.D. 589, 595 (N.D.Ill.1973). Instead, its ruling was one aimed at fostering private antitrust actions by refusing to permit the wrongdoer to escape the consequences of his acts by arguing that the direct purchaser plaintiff had suffered no injury since he passed on an illegal overcharge.

Defendants would have us rule that the problem of allocating the recoverable damages as between direct and indirect purchasers creates so many individual issues as to negate the required predominance of common factual questions. Although such determinations may require proof of the amount of any illegal overcharge passed on to the indirect purchaser by his direct-purchaser seller, *See In re Western Liquid Asphalt Cases, supra*, these determinations relate solely to the damage phase of the proceedings and not affect the question of predominance on the liability issues. The common liability issues as between direct

and indirect, final consumers in each of the proposed classes relate to the existence of the alleged conspiracy among defendants to increase or stabilize the price of plywood through the devices alleged in the complaints. In our view, these common questions predominate over any individual questions at the liability phase of the proceedings.

(B): *Asserted Individual Damage Issues*

■ Defendants argue that because of the prevalence of individually negotiated transactions for the purchase and sale of plywood, it would be impossible to use any formula in order to calculate the amount of damages due a member of any class and thus, that the individual inquiries necessary to make the damage determinations defeats the predominance requirement of Rule 23(b)(3).

Defendants' argument relates primarily to the manageability of these actions as class actions which, although separately discussed below, will be mentioned here. It should be noted that since we will split the liability and damage phases of these proceedings, this aspect of defendants' argument would not seem to affect the predominance of common questions on the liability issues.

Defendants rely on *Boshes v. General Motors Corp., supra,* for the proposition that the absence of a formula method for allocating damages among class members renders the classes unmanageable. We agree, however, with plaintiffs' rationale for the denial of class action status in *Boshes.* As they explain:

"The Court's denial of class treatment in *Boshes* rested on two facts, neither of which are present in the case at bar. First, the sheer size of the class, some 30 or 35 million purchasers, made it unmanageable. Second, the cars sold by each division of the defendant were different:

'Furthermore, each brand of GM automobiles offers a number of models, each available with a wide range of optional equipment.'

59 F.R.D. at 600. In the case *sub judice,* on the other hand, each defendant sells the same fungible product.

"The defendants' characterization of the basis for the denial of class in *Boshes* is directly contradicted by one of the very cases upon which the defendants rely. The defendants give their interpretation of the grounds for denial as follows:

'The reasoning is simply that the existence and amount of any pass-on depends upon the outcome of the individual negotiations and hence individual issues are created that transcend any common issues.'

Def. Annex C, p. 21. This interpretation of *Boshes'* denial of class is directly refuted in *Bill Minelli Cement Contracting, Inc. v. Richter Concrete Corp.,* 62 F.R.D. 381 (S.D.Ohio 1973) one of the cases on which the defendant relies. The *Minelli* court observed that the class in *Boshes* was denied certification because of its enormous size:

'In *Boshes v. General Motors,* supra, plaintiff sought damages against GM for an alleged conspiracy to monopolize and fix prices on passenger automobiles and a proposed class to consist of all purchasers of GM automobiles from 1965 until certification *was rejected on the grounds of unmanageability.'* (Emphasis added).

62 F.R.D. at 388." Reply of Plaintiffs in Major Producer Cases, p. 25 fn.

Thus, in our view, *Boshes* is not directly relevant to the position advanced by defendants.

Accordingly, we reject defendants' proffered argument that the prevalence of individually negotiated transactions for the purchase and sale of plywood negates the requisite predominance of common questions under Rule 23(b)(3).

(C): *Asserted Individual Fraudulent Concealment Issues*

■ Defendants suggest that there is a set of individual factual questions which arise from the allegations that defendants fraudulently concealed their illegal activi-

ties thus tolling the statute of limitations. Defendants argue that they will be prepared to cross-examine each and every class member to show that he has been aware for years of the existence of the practices of which the named plaintiffs complain, and hence that the class members cannot benefit from the fraudulent concealment doctrine to lengthen the period of limitations and the availability of the damage remedy.

We note, once again, that this aspect of defendants' argument relates to the predominance of common questions at the damage phase of the proceedings rather than the liability phase which is to be certified on class wide bases. The individual aspects of the statue of limitations defense can be adjudicated in the same fashion and at the same time as the individual damage issues. Such a method was recently approved in *Ungar v. Dunkin' Donuts of America, supra*, wherein the court stated:

"We agree with Professor Moore who has likened the statute of limitations problem to the damage problem, and has pointed out that in private treble damage actions brought under Rule 23(b)(3), courts have 'routinely' made provisions for separate trials or determinations of damages 'In which individual claims and *defenses on statutes of limitations*, reliance, knowledge, etc., can be adjudicated.' " 3B *Moore, supra*, 23.45(1), at 27–703, n. 13. "Accordingly, we conclude that class action determination is not undermined on predominance grounds by problems that some plaintiffs may have with the statute of limitations. Those problems can be determined in due course in the separate trials on damages, should the case reach that stage." 68 F.R.D. at p. 140.

Moreover, it is not at all clear that the fraudulent concealment issues are necessarily individual rather than class wide. In *State of Minnesota v. United States Steel Corp.*, 44 F.R.D. 559 (D.Minn.1969), the court dissected the fraudulent concealment issue, holding that fraudulent concealment required proof of two elements: use of fraudulent means and successful concealment. "Certainly proof of the first ele-

ment, if not also the second, is typical of the claims of the various members of the classes." (44 F.R.D. at 567 note 12.).

We agree with plaintiffs that in this litigation the fraudulent concealment issues appear to be generally common to all members in each of the classes. The issue is not whether plaintiffs knew of the existence of any basing point system or of the use of estimated weights but, rather, whether the named plaintiffs and the members of each of the classes knew of the alleged conspiracy among the defendant manufacturers. Thus, the crucial common questions on the fraudulent concealment issues will relate to whether defendants successfully concealed the existence of the alleged conspiracy which proof will be common among the class members in each class.

## (2) SUPERIORITY OF CLASS ACTIONS

 In our view, the maintenance of the five nationwide classes of plywood purchasers defined below is superior to other available methods for the fair and efficient adjudication of the controversy. There is only one practical alternative to class action designations and that is that each of the actions proceed independently on behalf of the plaintiffs named therein and others who may intervene under the provisions of Rule 24, F.R.Civ.P.

The commonality of the issues of liability, the economic necessity for class actions as well as the total savings of judicial time and expense are factors which persuade us to conclude that the class action device is appropriate for this litigation. The class action device will allow a uniform and universally binding determination of the common questions of law and fact raised by the complaints in these actions.

Plaintiffs in all active actions in this litigation have requested that we designate certain groups of actions as class actions. Although we will modify this request, it is nonetheless clear that, at least in so far as the named plaintiffs are concerned, they have relinquished their interest in individually controlling the prosecution of their separate actions. Any class member who de-

sires to control his own proceeding may, by the opt out device, institute a separate action and, therefore, is not necessarily relinquishing control of this claim by the class action device. Accordingly, the Rule 23(b)(3)(A) factor augurs favorably for class action treatment.

Because of the transfer of all actions to this Court for pretrial proceedings under 28 U.S.C. Section 1407, all of the actions commenced by the members of any of the proposed classes are already before us. Thus, the factors listed in Rule 23(b)(3)(B) and 23(b)(3)(C) need no further exposition. Indeed, the Judicial Panel recognized that the conflicting class allegations in the complaints was a basic reason for centralizing all actions in this district.

## MANAGEABILITY

Although not listed as a separate and independently required determination, the issue of the manageability of these actions as class actions deserves special attention.

(1): *Class Designations*

█ Plaintiffs have jointly requested that we designate certain groups of actions as class actions to proceed against all defendants regardless of whether all defendants had originally been named in each of those actions. Suffice it to say that the procedural defects inherent in such a proposed cross action inclusion of defendants, *See In re Transit Co., Tire Antitrust Litigation,* 1975 Trade Cases, Par. 60,144 at pp. 65,409–65,410, would, in our view, render the litigation unmanageable as class litigation.

We, therefore, conclude that only one action on behalf of each of the nationwide plaintiff classes should be certified as class actions with all other actions to remain dormant at least during the discovery phase of the proceedings. Since the "industry wide" cases contain the broadest array of defendants, it is our view that the expeditious resolution of this litigation can be achieved by certifying one of them to proceed on behalf of each of the classes plaintiff therein asserted.

The plaintiff classes which are hereby certified on the liability issues are defined as follows:

CLASS I—DEALER CLASS: All private persons or business entities (with the exception of the members of the other classes herein certified and softwood plywood brokers, office wholesalers and other persons acting for or on behalf of softwood plywood manufacturers) who, since January 1, 1963, have purchased softwood from the manufacturers thereof, directly or through brokers, office wholesalers, or other persons acting for or on behalf of the manufacturers thereof.

CLASS II—SUBCONTRACTOR CLASS: All private persons and business entities who as specialty contractors or subcontractors purchased softwood plywood since January 1, 1963, and used the softwood plywood in the construction of any structure of any kind or character, or any part thereof, built for the account of others.

CLASS III—CONTRACTOR CLASS: All private persons and business entities who since January 1, 1963 as general building contractors built or caused to be built for the account of others any structure or part thereof of any kind or character involving the use of softwood plywood.

CLASS IV—BUILDER–OWNER CLASS: All private persons and business entities who since January 1, 1963 built or caused to be built for their own account, whether for their own use, rental or sale, any structure of any kind or character involving the use of softwood plywood.

CLASS V—MANUFACTURER CLASS: All private persons and business entities who since January 1, 1963 regularly, in the course of their business, manufactured any product for resale, which product utilized softwood plywood as a component, consisting of two subclasses:

(A) Those who purchased softwood plywood in truckload or carload quantities; and

(B) All other such manufacturers.

Each of the classes set forth above shall be defined territorially as all private persons and business entities throughout the United States and its territories. There shall be excluded from each and every of the foregoing classes any business entity which is owned or controlled by any defendant in these actions.

Each of the foregoing plaintiff classes shall be maintained against the following categories of defendants which shall consist of:

(a) Georgia Pacific Corporation, Champion International Corporation, Weyerhaeuser Company, Vancouver Plywood Company, Williamette Industries, Inc. Boise Cascade Corporation, International Paper Company, being the defendants denominated as the "major defendants".

(b) Louisiana-Pacific Corporation, Tremont Lumber Company, Kirby Lumber Corporation, Olinkraft, Inc., Anthony Forest Products Company, Scotch Plywood Company, Owens-Illinois, Inc., Arkla Chemical Corporation, Temple Industries, Inc., Union Camp Corp., Dixon Plywood Company, Louisiana Plywood Corporation, Vanply, Inc., MacMillan Bloedel, Inc., being the defendants denominated as the "southern pine producers."

(c) American Can Company, Columbia Plywood Corporation, Fibreboard Corporation, The Pacific Lumber Company, Pope & Talbot, Inc., Potlatch Corporation and its subsidiary, St. Maries Plywood Company, St. Regis Paper Company, Simpson Timber Company, Bohemia Inc., Medford Corporation, including its division, Sil Ply Products, and its former subsidiary, Southern Oregon Plywood, In., Evans-Products Company, including its former wholly-owned subsidiary, Van-Evan Company, Plum Creek Lumber Company, being the defendants denominated as the "western only producers."

The following actions are hereby certified as class actions to proceed on behalf of the classes designated therein, as modified and defined above, and against the defendants previously specified:

### CLASS I—DEALER CLASS

*Gabriel Building Supply Company, Inc., et. al. v. Agnew Plywood, et. al.,* C.A. 72–522.

### CLASS II—SUBCONTRACTOR CLASS

*Altman Bros. Inc. of Massachusetts, et. al. v. Georgia-Pacific Corporation, et. al.,* C.A. 73–2860.

### CLASS III—CONTRACTOR CLASS

*James I. Barnes Construction Company, et. al. v. Georgia-Pacific Corporation, et. al.,* C.A. 73–2861.

### CLASS IV—BUILDER–OWNER CLASS

*West Deer Park Associates, et. al. v. Georgia-Pacific Corporation, et. al.,* C.A. 73–2671.

### CLASS V—MANUFACTURER CLASS

*Robert Schubel, d/b/a Cabinet Crafts, et. al. v. Georgia-Pacific, et. al.,* C.A. 73–3345.

---

The designation of the counsel who are to represent each of the classes is complicated by our refusal to accept plaintiffs' proposal for the certification of groups of actions. Since we have determined that the proper actions to be certified are the "industry

wide" cases, it seems reasonable to designate as Chief Counsel for each of the classes, the attorneys representing the named plaintiffs in the certified actions. The attorneys whom plaintiffs previously agreed would represent each of the classes shall constitute a Committee of Counsel for class (designate class) for each of the classes under the chairmanship of the Chief Counsel for each class. Plaintiffs' counsel in all of the actions in this litigation shall constitute a Committee of Counsel in All Actions under the chairmanship of Lead Counsel heretofore designated by Order filed December 19, 1974.

The following attorneys and/or their firms are hereby designated as Chief Counsel and/or members of the Committee of Counsel for each of the certified classes:

### CLASS I—DEALER CLASS

Garon, Brener & McNeely (Chief Counsel)

| Wolf, Block, Schorr & Solis-Cohen ) | Members of Committee of |
| Farella, Braun & Martel ) | Counsel |

### CLASS II—SUBCONTRACTOR CLASS

Mesirov, Gelman, Jaffe & Creamer (Chief Counsel)

### CLASS III—SUBCONTRACTOR CLASS

Sommer, Tinkham, Barnard, Freiberger & Scopelitis (Chief Counsel)

### CLASS IV—BUILDER–OWNER CLASS

| Dansansky, Dickey, Tydings, Quint & Gordon ) | Co-Chief Counsel |
| Seymour & Patton ) | |

| David Berger, P.A. ) | Members of Committee of |
| Torshen, Fortes & Eiger, Ltd. ) | Counsel |

### CLASS V—MANUFACTURER CLASS

Kramer & Salus (Chief Counsel)

Harold E. Kohn, P.A. (Member of Committee of Counsel)

---

(2) *Conduct of the Proceedings*

Although we have certified several of the "industry wide" cases to proceed as class actions and have ordered that all other actions remain dormant at least during the discovery phase of the proceedings, the segregation of defendants into three separate groups allows us to further limit any manageability problems at this point in the proceedings.

We have indicated that the class actions which we have certified shall be maintained against three categories of defendants: major defendants, southern pine producers and western only producers. The certified actions, therefore, include the broadest array of defendants named in any of the complaints in the litigation. In order to insure that the efforts of the parties and court be directed to resolving the most significant aspect of the litigation at the outset, however, we hereby order that all further proceedings against the southern pine and western only producers be stayed until further order of the court. This "backburner" approach will allow the maximum utilization of the resources available to plaintiffs, without prejudicing their case against any of the smaller defendants. The major defendants, similarly, will not be prejudiced by this backburner approach since it will allow them to focus directly on plaintiffs allegations without becoming intertwined in the procedural and substantive problems surely to be encountered were the actions to

proceed against all defendants simultaneously.

### (3) General Considerations

The certifications and orders we have made above greatly reduce any difficulties which may be encountered in the management of this litigation as class litigation. The size of the classes, although large, are not of such magnitude that would render impossible the task of notifying class members. From the records already established in the *Gypsum* litigation and supplementary information available through the major defendants, plaintiffs can, in our view, devise a feasible system for notifying the members of each of the classes of the pendency of this litigation. Plaintiffs have indicated their desire and ability to bear the costs of notice to all such class members and, therefore, we foresee none of the notice problems which plagued the plaintiff in *Eisen*.

With respect to notice to class members, Lead Counsel for plaintiffs together with the Committees of Counsel established for each of the classes shall submit to the Court within 30 days of the date of this order and serve upon counsel for the defendants their proposal for the form and method of giving notice to the class members. Defendants shall have 30 days to reply, to file such response as they deem appropriate with the Court and shall serve copies of the same upon lead counsel for plaintiffs and counsel for the classes above designated.

Although this litigation is complex and the problems to be encountered difficult, the management of this litigation is possible given the cooperation of all counsel.