**In re CORRUGATED CONTAINER ANTITRUST LITIGATION.**

All actions except Draper-King Cole, Inc., et al. (C.A. No. H–78–1226) Franklin Container Corp., et al. (C.A. No. H–78–671) Iowa Beef Processors, Inc., et al. (C.A. No. H–78–1263) ITT Continental Baking Co., et al. (C.A. No. H–78–376) United Farmers Cooperative, Inc., et al. (C.A. No. H–77–2158) United Foods, Inc., et al. (C.A. No. H–78–4)

**MDL No. 310.**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 6, 1978.

Stephen D. Susman, William E. Wright, Houston, Tex., Vance K. Opperman, Minneapolis, Minn., for plaintiffs.

Robert Malinak, Baker & Botts, Houston, Tex., for all defendants.

## MEMORANDUM AND ORDER

SINGLETON, District Judge.

This litigation is comprised of fifty-two private treble damage actions consolidated for pretrial purposes by the Judicial Panel for Multidistrict Litigation under 28 U.S.C. § 1407 and transferred to this court November 29, 1977. The complaints allege that the defendants, thirty-seven manufacturers of corrugated sheets and containers and the Fibre Box Association, engaged from at least 1960 until January, 1978, in a conspiracy to fix, raise, maintain and stabilize the prices of corrugated sheets and corrugated containers.

Before the court is the joint motion of most of the plaintiffs in these consolidated cases [1] for certification of these actions as a class action. The class which plaintiffs seek to represent is that of all persons in the United States (excluding defendants and all subsidiaries and affiliates of defendants and all independent corrugated box manufacturers) who purchased corrugated containers or corrugated sheets from any defendant, or any subsidiary or affiliate of any defendant, at any time during the period from January 1, 1960 to January 25, 1978. The court has considered the motion, the supporting and opposing briefs, and the numerous affidavits and exhibits submitted by all parties, and is of the opinion that these cases are suitable for class treatment for the reasons discussed herein.

## I. NECESSITY FOR CLASS DISCOVERY AND EVIDENTIARY HEARING

Initially, defendants contend that under the case law of the Fifth Circuit the court must await extensive discovery and hold an evidentiary hearing before it can certify a class in these cases. Plaintiffs have had the benefit since mid-May of the documents which each defendant submitted to the Houston grand jury that investigated the corrugated container industry and returned two indictments against certain companies and individuals. They have not sought any further discovery on the class question. Defendants have sought very extensive discovery on the question which would be both expensive and time-consuming and which would not, in this court's opinion, add to the defendants' or the court's information on the crucial points. Instead the court invited the parties, and they agreed, to submit any and all affidavits they desired the court to consider concerning the market structure, pricing process, and other aspects of the corrugated container industry. Defendants' primary contention is that the corrugated container industry is too diverse in its structure, products, and pricing procedures to be suitable for class treatment. This contention will be discussed at length later in this opinion. It suffices for the moment to say that information on these points is readily available to the defendants without the expensive discovery they sought, and that it can be and has been made available to the court through affidavits without the necessity for in-court testimony. Plaintiffs have also submitted many exhibits and affidavits indicating their proposed methods of proof in these cases. The court finds that further discovery is unnecessary in these cases, as there is ample evidence already in the record as to each of the requirements for class certification under Rule 23, Federal Rules of Civil Procedure.

## II. THE CORRUGATED CONTAINER INDUSTRY

A brief sketch of the corrugated container industry will be helpful here. This

---

1. All class action plaintiffs except those in Franklin Container Corp., (a suit proceeding on behalf of a different class of plaintiffs) voluntarily join in this motion. There are also five individual actions in which the plaintiffs do not, of course, seek class certification.

sketch is drawn from the voluminous material submitted by all counsel and from the court's experience gained in the pretrial procedures in the two cases being brought by the United States against many members of the corrugated container industry, Criminal Nos. H-78-11 and H-78-12. An exhaustive picture of the industry is presented in *United States v. Container Corp. of America*, 273 F.Supp. 18 (M.D.N.C. 1967); much of that information about the industry is apparently still correct today.

Corrugated containerboard is made by gluing a fluted sheet, the corrugating medium, between liners of flat paper facing. Containerboard may be single-wall, with one fluted sheet and two liners (by far the most common type); double-wall, with two fluted sheets between three liners; or triple-wall, with three fluted sheets between four liners. In the manufacture of corrugated containers, containerboard is cut, scored, creased, and printed. Joints are fastened by taping, gluing, or stitching with wire. Generally corrugated containers are manufactured in many sizes and shapes, are frequently printed to the customer's specifications, and may have any of numerous special features such as waterproofing, ventilating holes, handholes, and so forth. There are some common stock items, but many corrugated containers are specially adapted for the purchaser. In spite of the fact that one purchaser's cardboard box may not be suitable for another purchaser's needs, when made to the same specifications the box of one manufacturer is virtually identical to that of another manufacturer. A small percentage of boxes are beyond the manufacturing capacity of most defendants because they require some specialized equipment.

Corrugated containers are made by three types of manufacturers. "Integrated manufacturers" make the liners and the corrugating medium, as well as making containerboard and corrugated containers. Almost all of the defendants are integrated manufacturers. "Independent manufacturers" are those who do not make the liners or corrugating medium but purchase these items from integrated manufacturers and then assemble them into containerboard and containers. At least one defendant, Potlatch Corporation, is an independent manufacturer. Finally there are sheet plants, which purchase containerboard already made by integrated or independent manufacturers and fashion it into corrugated containers. Sheet plants are members of the class plaintiffs seek to represent.

Corrugated sheets and boxes are relatively bulky and inexpensive to make. Since shipping costs are therefore high in relation to the cost of manufacture, they tend to be made and sold in small geographical areas, the common radius of customers for a manufacturer being under 200 miles. Costs of labor, paper, energy, etc., vary from one area to another, so that the final cost of the same box may vary from one part of the country to another. They are also relatively costly to store and are commonly bought on a short-term basis, a customer often having more than one supplier of the same box.

The corrugated container industry is concentrated. Figures cited to the court for 1975 reveal that although the defendants in these cases constituted less than five per cent of the firms manufacturing corrugated containers, they accounted for seventy-two per cent of the dollar volume of sales. Almost all the defendants maintain more than one corrugated container plant; many of them have plants scattered throughout the country. Pricing is commonly done at the plant level, with apparent supervision at the national level for at least some companies. In spite of this local pricing practice, there have been numerous instances documented in the industry's trade publications where company-wide price increases of a fixed percentage were announced. At least some of the defendants publish pricing manuals and/or price lists for stock items which are used throughout the country. Many of the defendants handle certain

large customers on a national basis ("national accounts").[2]

Against this background, we will now consider the pending motion.

## III. REQUIREMENTS OF RULE 23

Rule 23(a), F.R.C.P., sets out the basic requirements for all class actions. It provides:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, plaintiffs must satisfy the requirements of Rule 23(b)(3):

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Plaintiffs have the burden of establishing that each of these prerequisites is met, *EEOC v. D. H. Holmes Co.*, 556 F.2d 787, 791 (5th Cir. 1977).

In deciding this issue, which has been hotly contested by the defendants, the court has benefited from the guidance afforded by the Fifth Circuit's recent opinion in *Alabama v. Blue Bird Body Company, Inc.*, 573 F.2d 309 (5th Cir. 1978). *Blue Bird* makes clearer what sort of proof plaintiffs must adduce in order to satisfy the requirements of Rule 23(b)(3), and it will be discussed in greater detail below.

The court will consider each of these requirements separately.

### Numerosity.

Plaintiffs estimate that the class they seek to represent numbers at least in the tens of thousands. Defendants' estimate is 300,000. There can be no serious question that joinder of all these parties, geographically dispersed throughout the United States, would be impracticable. Defendants have not contested plaintiffs' assertion that the requirement of numerosity has been met.

### Commonality.

There are unquestionably common questions of law or fact in this case. Each plaintiff will have to show the existence of a conspiracy to fix, raise, maintain, and stabilize the prices of corrugated sheets and containers. The existence, scope, and efficacy of the alleged conspiracy are clearly questions common to all class members. Defendants have not contested this point.

### Typicality.

The court finds the claims of the named plaintiffs to be typical of the claims of the class. All plaintiffs must establish the

---

**2.** Whether these national accounts are, as plaintiffs assert, for "the obvious purpose . . (of establishing) uniform nationwide prices for national accounts" or, as defendants insist, "no more than a convenience . . .. Pricing for such accounts is still individually negotiated at the local plant level . . .." is a question which the court cannot and must not decide at this point.

same basic elements to prevail—the existence, scope, and efficacy of a nation-wide conspiracy. There are no differences as to the type of relief sought or the theories of liability upon which plaintiffs will proceed. Except as to the amount of damages each party claims, the cases of the representatives are coextensive with those of the rest of the class.

Defendants assert three arguments against the typicality of the claims of the plaintiffs now before the court. The first two are based on their avowed belief that classwide proof of a national conspiracy is impossible. If classwide proof is impossible, defendants say, each plaintiff will have to prove a conspiracy which affected his own purchases in his own local market, and no plaintiff's claim will be typical of another's. For the reasons to be discussed below, we do not accept defendants' underlying assumption that classwide proof of conspiracy and impact is impossible, and we therefore see no impediment to class certification in this respect.

Defendants' third argument has to do with the claim of fraudulent concealment to toll the statute of limitations. To be successful in prosecuting a claim for damages before 1974, plaintiffs must show acts of concealment by defendants, failure by plaintiffs to discover facts which would have alerted them to a possible cause of action, and due diligence on each plaintiff's part. Defendants argue that individualized proof will be required as to the last two elements, and that therefore no plaintiff's claim can be coextensive with another's in this regard. This argument really relates to the predominance of common questions at the damage phase of the proceedings.[3] Rule 23(a)(3) does not require perfect identity, but merely that the claims be based on the same legal or remedial theory and that there be no conflicting interest between

representative and class members. *Gonzales v. Cassidy*, 474 F.2d 67, 71 n. 7 (5th Cir. 1973). These criteria are clearly met in spite of any differences regarding the statute of limitations. *In re Independent Gasoline Antitrust Litigation*, 1978–1 Trade Cas. § 62,085 at 74,727–28 (D.Md. June 8, 1978) 79 F.R.D. 552 at 556; *In re Plywood Antitrust Litigation*, 76 F.R.D. 570, 585–86 (E.D. La.1976); *In Re Sugar Antitrust Litigation*, 73 F.R.D. 322, 348 (E.D.Pa.1976).

*Representativeness.*

In deciding whether given individuals will adequately represent their classes, courts have traditionally considered the possibility that the individuals may have interests antagonistic to those of the class. Here, as noted above, the issues to be determined for all plaintiffs are identical as to the scope and efficacy of the alleged conspiracy, and the court perceives no possibility of any antagonism of interests which might prejudice absent class members. Of course, should any antagonism develop, the court has ample authority to deal with it through decertification or the creation of subclasses.

Further, courts have considered the ability of the named plaintiffs to finance an effective suit through the retainer of competent counsel, the giving of class notice, etc. Defendants have not challenged the quality of plaintiffs' counsel (many of whom are men of national reputation in antitrust litigation) nor the financial ability of the named plaintiffs to support the effective prosecution of this suit. Indeed, the various plaintiffs, through affidavits appended to the motion for class certification, have indicated an awareness of their obligations in this respect and their willingness to assume these obligations. The large number of plaintiffs, many of them nationally known businesses, makes it extremely un-

---

3. Rule 23(c)(4)(A) provides that "an action may be brought or maintained as a class action with respect to particular issues." As noted in *Moore*, "In the treble damage anti-trust suits, and securities fraud actions, brought under (b)(3), courts have routinely made provision for separate trials or determinations of damages, in

which individual claims and defenses on statutes of limitations, reliance, knowledge, etc. can be adjudicated." 3B Moore's Federal Practice § 23.45 at 23–316 n. 13 (2d ed. 1978). *See, e. g., Seiden v. Nicholson*, 69 F.R.D. 681 (N.D. Ill.1976).

likely that any problem will arise as to the vigorous prosecution of the suit.

*Predominance of Common Questions.*

To satisfy the requirements of Rule 23(b)(3), the existence of common questions of law or fact are not enough: common questions must predominate. Rule 23(b)(3) provides a procedure through which similar disputes may be efficiently and economically disposed of, without the risk of differing or conflicting results, but because the affiliation among class members may be looser in a 23(b)(3) action, there is a greater risk that a representative suit may be unfair to some parties. The court is therefore required to take special consideration of the relationship of the common to the individual questions.

> Thus, the predominance test really involves an attempt to achieve a balance between the value of allowing individual actions to be instituted so that each person can protect his own interests and the economy that can be achieved by allowing a multiple party dispute to be resolved on a class action basis.

7A Wright & Miller, Federal Practice and Procedure: Civil § 1777 at 47.

There is no question that common questions of predominant importance exist here. All plaintiffs will have to prove the existence of a conspiracy and fact of injury to plaintiffs' class ("impact"). As to amount of damages, all parties agree that at least some individualized treatment will be required. Treble-damage antitrust case law is uniform, however, in holding that individual questions relating solely to the amount of damages will not preclude class treatment. *See, e. g., Windham v. American Brands, Inc.*, 539 F.2d 1016, 1021 (4th Cir. 1976); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 798 (10th Cir. 1970); 3B Moore's Federal Practice § 23.46 at n. 5 and cases cited therein.

Defendants' argument, simply stated, is that the admittedly common issues of existence and impact of a conspiracy cannot be shown on a classwide basis, through common proof, and that the court would therefore be required to conduct many mini-trials to determine these issues on an individual basis. This argument is based upon their characterization of the corrugated container industry. They say that their products are non-fungible and their markets, prices, and pricing procedures localized.

Defendants cite extensively to *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309 (5th Cir. 1978), in which the Court of Appeals reversed the trial court's certification of a national class of school bus purchasers and remanded to the trial judge for further evidence on certain points relevant to a later determination of the class question. *Blue Bird* has substantial impact on our decision and will therefore be discussed in some detail here. The state of Alabama, its superintendent of education, and a county board of education brought a civil antitrust action against several manufacturers and distributors of school bus bodies for an alleged price-fixing and monopolization conspiracy. The plaintiffs sought to represent two classes, a statewide class of government entities which purchase bus bodies and a nationwide class of similar entities. The defendants asserted there, as here, that school buses are not fungible but are made to customer specifications and sold through various procedures which may have an effect on the ultimate price. The trial judge certified both classes, apparently without requiring any evidence on the nature of the school bus industry. As to the national class, he certified only because of his plan to bifurcate the damage issue and, in the event the plaintiffs were successful in the liability phase, transfer all damage claims to their respective states under 28 U.S.C. § 1404(a), since the processing of the damage claims would "paralyze the federal court system" in his district. He then certified his orders for interlocutory appeal under 28 U.S.C. § 1292(b).

The Fifth Circuit affirmed as to the statewide class but reversed and remanded as to the national class, since the only evidence in the record did not make it clear that plaintiffs could proceed with generalized proof as to that class. The panel make

several points of great importance for the case before the court today: (1) fact of injury, or "impact", is a necessary part of liability in a civil antitrust action; (2) in order to satisfy the predominance requirement, plaintiffs must show not only that there are predominating questions which all the class must prove, but also that they are susceptible of classwide proof; (3) the court must examine and understand the industry in question to apply Rule 23 properly, in spite of the general prohibition against prejudging the merits at the certification stage; and (4) the unique facts of each case and industry will usually decide the outcome.

Turning now to the cases before the court, it is clear that plaintiffs must establish that a national conspiracy existed in order to recover. Defendants urge that if any price-fixing conspiracies existed they must have been local in character, since the industry is inherently fragmented and incapable of concerted action. Should plaintiffs have to build their case like a patchwork quilt, showing price-fixing in one small market after another, the economy offered by class treatment would be lost. Plaintiffs, however, are confident that they will be able to offer generalized proof of conspiracy. They point to *United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), in which a price-fixing conspiracy was found among eighteen defendants (most of whom are also defendants in the present cases) over a nine-state area, as showing that a large-scale conspiracy can exist in the cardboard container industry and that it can be shown by generalized proof. They have offered some evidence to show the trend of their proposed proof: defendants' documents showing price information exchanges directed and sanctioned at the national levels of management; publications showing nationwide percentage price increases, often in parallel fashion; defendants' documents showing price information was exchanged in order to stabilize and maintain the industry price structure. They have submitted for the court's perusal segments from the evidence offered in *United States v. Container Corp. of America* tending to show the same elements plaintiffs will have to establish in order to prevail on the conspiracy issue.

Whether the proof ultimately adduced will establish the existence of a national conspiracy among the defendants is not in issue here; it is not the court's function to weigh this evidence for its truth but merely to ascertain whether it is of a type suitable for classwide use. The court is persuaded that the conspiracy issue—whether price information was exchanged; if it was, with what intent; whether action was taken by the defendants based upon such exchanges; etc.—is susceptible of generalized proof, since it deals primarily with what the defendants themselves did and said.

> It is true, as the defendants urge, that there may be local variations in marketing practices and the like . . . but these facts do not change the central and common element of these cases—the question whether the defendants acted in concert to decrease competition among them. If this element is shown, differences in the way the plan was manifested around the country are unimportant, except perhaps as they may affect the amounts of recovery different plaintiffs may obtain.

*In re Master Key Antitrust Litigation*, 1975–1 Trade Cas. § 60,377 at 66,637 (D.Conn.1975).

The proper manner of proving impact in a treble-damage antitrust case has been the subject of important opinions by courts in many circuits in recent years. *See, e. g., Alabama v. Blue Bird Body, Co. Inc., supra; Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3rd Cir. 1977); *In re Master Key Antitrust Litigation*, 528 F.2d 5 (2nd Cir. 1975). The traditional model, in which proof of a conspiracy plus proof of purchase was in itself sufficient evidence of impact, has come under attack and has been considerably refined in cases where the product was not standardized or the price fluctuated during the temporal or spatial scope of the conspiracy. We turn again to

*Blue Bird* for aid in determining what plaintiffs will have to show in order to prevail.

> "This proof of injury in a price-fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supracompetitive prices for school buses. If there was some uniformity in the quality and price of a school bus, then this requirement of 'impact' might cause few problems."

573 F.2d at 328. Uniformity of quality does not appear to present a serious problem in the cases before the court. Justice Douglas specifically held, in *United States v. Container Corp.*, that corrugated containers are fungible. 393 U.S. at 337, 89 S.Ct. 510. Plaintiffs have also submitted evidence to that effect culled from defendants' documents. Uniformity of price clearly did not exist, and could not conceivably have existed over the eighteen-year period encompassed by the complaints. Does this mean that class proof of impact is impossible? It is clear that *Blue Bird* does not hold so much. "We are not attempting, however, to hold as a matter of law that the impact requirement in the case before us defeats any possibility of a class certification." *Id.* at 328. The court cited with apparent approval the following language from *Bogosian* :

> If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "(T)he burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . . proof of some damage flowing from the unlawful conspiracy . . .." *Zenith Radio [Corp. v. Hazeltine Research, Inc.]*, *supra*, 395 U.S. [100] at 114, 89 S.Ct. [1562] at 1571 n. 9 [23 L.Ed.2d 129]. Under these circumstances, proof on a common basis would be appropriate. Even if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price, it might be possible to designate subclasses to conform with these variations. *See In re Antibiotic Antitrust Actions, supra*, 333 F.Supp. [278] at 281 [D.C. S.D.N.Y.1971].

561 F.2d 455, cited at 573 F.2d at 326. This is precisely how the plaintiffs in these cases are offering to proceed. They have submitted as indications of the type of proof they mean to use two affidavits of Richard C. Hoyt, an economist with considerable experience as an expert witness in antitrust litigation. After reviewing the documents which plaintiffs have submitted as showing the nature of the proof they mean to bring on the nature of the industry and the activities of the defendants, and assuming as true the points those documents are intended to prove, Mr. Hoyt states, "(I)t is also my opinion that an agreement to exchange price information among the defendants, who collectively occupy a relatively dominant market position, would likely have the effect of stabilizing and maintaining the prices of corrugated containers sold to all purchasers at artificially high levels." Mr. Hoyt then goes on to state that, "(I)t is likely that either of two generally accepted methodologies, either individually or in combination with one another, can be used to determine with a reasonable degree of certainty the amount of damages suffered by the class and each class member." If this second prognostication should prove accurate, it will, of course, simplify the calcu-

lation of individual damages, reducing it to a more or less mechanical task.

Mr. Hoyt's second affidavit, prepared after he had studied the affidavits submitted by the defendants in opposition to the plaintiffs' motion for class certification, contains the following language: "There is nothing in defendants' papers submitted in opposition, including defendants' affidavits, which indicates to me that the views expressed in my initial affidavit are incorrect or should be modified. . . . Price variations such as those described by the defendants are not inconsistent with the establishment or maintenance of an artificially inflated general price level, *since the artificially inflated general price level is the point from which all such price variations start.*" (Emphasis added)

It is the court's opinion that defendants' essential contention is that plaintiffs cannot prove what they assert they will prove. The court must not prejudge the merits of this case in order to make a class certification decision. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). It is certainly true that the plaintiffs may not ultimately be successful in demonstrating all they hope to show, but the threshold showing they have made here is sufficient to convince the court that what proof they offer will be sufficiently generalized in nature that even as to the impact issue the class action device will provide a tremendous savings in time and effort to the judiciary and to the parties. If plaintiffs do develop statistical and economic proof of impact, the weight to be given that evidence is for the trier of fact at a later date.

*Superiority.*

Since classwide proof of the common questions appears to be possible, class treatment is certainly superior to any other procedure. If these actions do not proceed as a class action, many of the plaintiffs' class would be effectively foreclosed from pursuing their claims. Even a successful business might well shrink from the investment in time and money which this type of litigation entails. "Few are the individual claimants with a sufficient interest at stake or resources to bring a suit requiring proof of a conspiracy among business corporations. Discovery expense alone normally would be prohibitive." *Illinois v. Harper & Row Publishers, Inc.*, 301 F.Supp. 484 (D.Ill.1969).

The treble damage provision of the Sherman Act is designed to encourage the private sector to serve as "private attorneys general" in enforcing the antitrust law. *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 262, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). "(T)he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968). Where the private action is not an economically feasible alternative for the victims, this deterrent effect is lost. For this reason, a number of circuits have held that in deciding the issue of class certification in an antitrust or other case involving enforcement of federal policy, doubtful cases should be resolved in favor of certification. *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3rd Cir.), *cert. denied sub nom. Glen Alden Corp. v. Kahan*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir.), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1968); *Hohmann v. Packard Instrument Co., Inc.*, 399 F.2d 711 (7th Cir. 1968).

Even if a significant percentage of direct purchasers of corrugated sheets and containers did bring suit, pursuing each claim in a separate action requiring weeks or months of trial time, the burden to the courts would be enormous, the needless duplication of effort would be extremely expensive for all parties, and the possibility of conflicting outcomes is readily apparent. Therefore, in balancing the advantages of class treatment against possible individual

interest in maintaining separate actions, the court finds the balance heavily in favor of the class action.

Since all similar suits filed in the federal courts are being consolidated with these under 28 U.S.C. § 1407, and the possibility of ultimate § 1404(a) transfer to this court exists, these cases present no problems concerning litigation already commenced in other forums. Rule 23(b)(3)(C). It is clearly preferable to have this litigation concentrated in one forum.

For these reasons, the court concludes that class treatment is superior to other available methods for the fair adjudication of these claims.

*Manageability.*

Although manageability is one of the criteria for the court to consider in deciding the superiority of the class action, defendants have questioned it so extensively as to justify separate discussion of it here. A case of this magnitude inevitably poses problems of manageability. Fortunately, the Federal Rules of Civil Procedure, Rule 23(c) and (d), provide many tools for the court to work with. The attorneys for all parties have already demonstrated an ability and willingness to work together and with the court. Both sides are well organized, joint pleadings have been filed, and briefing and argument have been assigned to designated spokesmen within each organization. Should this situation deteriorate, the court has the power under Rule 23(d)(1) and (5) to compel their cooperation.

The court has considered methods of dealing with the manageability problems posed by these cases and, although they are obviously of substantial concern, has concluded that such problems can be handled.[4] Class notice does not pose a significant problem in this case, since the names and addresses of the class members may be easily obtained from the defendants' business records and, as noted above, the representative

plaintiffs are prepared to finance it. The determination of damages, even if it eventually must be made on an individual basis, is susceptible to several methods of treatment, among them reference to a master or magistrate or the possibility that the trial on the merits may establish a formula for computing damages, as the plaintiffs' expert witness Hoyt asserts. It is by no means a necessary corollary of class certification that courts all over the country will be deluged with minitrials on the damage issue, a prospect which clearly troubled the court in *Blue Bird*.

The Manual for Complex Litigation states, "Dismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule." *Manual*, Part I § 1.43 n. 72 (1977). "Because of the almost plenary authority granted to the court to control class action litigation, the problems of administration, alone, ordinarily should not justify denial of an otherwise appropriate class action except when the administration and resources required to be devoted strictly to administrative matters will frustrate the securing of ultimate relief to which the class members may be entitled." *Id.*, pp. 41–42. With this advice in mind, with the extensive armory of tools provided by the Federal Rules of Civil Procedure and developed by federal courts throughout the country, and with the aid of imaginative and efficient counsel, this court has concluded that this problem does not warrant refusal to certify.

## IV. CONCLUSION

In this memorandum, the court has attempted briefly to sketch the arguments put forward by counsel and the court's considered opinion of these arguments. The Advisory Committee's note on the 1966 amendment to Rule 23, quoted in *Blue Bird*, explains that (b)(3) is designed to deal with "cases in which a class action would achieve

---

4. Although these cases are before the court under 28 U.S.C. § 1407 for pretrial purposes, the court is mindful of the possibility of transfer for all purposes under § 1404(a). Rules of

Procedure of the Judicial Panel on Multidistrict Litigation, Rule 11(b), 78 F.R.D. 561, 569 (1978).

economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." F.R.C.P. 23, Advisory Committee Note (1966). Assuming for the purposes of this motion that a conspiracy existed among the defendants to fix, raise, maintain, and stabilize prices of corrugated sheets and containers, the class action device offers the only realistic means of seeking redress for injured purchasers. The plaintiffs have satisfied the court that they understand the burden of proof they must meet and that they intend to meet it on a classwide basis at least as to the existence and impact of the alleged conspiracy. The administrative problems the suit will pose, though far from negligible, do not appear unsurmountable. After carefully considering all these questions, the court concludes and it is ORDERED that plaintiffs' joint motion for determination of these actions as a class action should be and hereby is granted.

For the present, all plaintiffs in these cases shall act as class representative; however, to facilitate the administration of this litigation, it is the court's intention to decrease the number of representatives to no more than ten. Accordingly, it is ORDERED that plaintiffs submit a proposed list of no more than ten class representatives for the court's consideration by October 4, 1978.

It is further ORDERED that counsel for plaintiffs submit to the court by September 20, 1978, their proposed form of notice, consistent with the requirements of Rule 23(c)(2), Federal Rules of Civil Procedure. The defendants shall have until October 4, 1978 to submit any objections they may have to this proposed form of notice and any suggestions they may have for changes therein.

A pretrial conference is hereby set for Tuesday, October 17, 1978, at 9:30 a. m., to discuss *inter alia* final approval of the class notice, final approval of the class representatives, and the parties' proposed schedules for further discovery.