**Thomas Edward DAVIS and Ruth B. Brodhead, Plaintiffs,**

v.

**NORTHSIDE REALTY ASSOCIATES, INC., et al., Defendants.**

No. C 80–508 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

May 7, 1982.
Order July 15, 1982.

John L. Taylor, Jr., John G. Grubb, Jr., McDaniel, Chorey & Taylor, Atlanta, Ga., Edwin F. Hendricks, Robert L. Palmer, R. Douglas Dalton, Martori, Meyer, Henricks & Victor, Phoenix, Ariz., for plaintiffs.

Richard D. Elliott, Harman, Asbill, Roach & Nellis, Atlanta, Ga., for Barton & Ludwig, Inc., Chandler B. Barton and Coldwell Banker.

James O. Wilson, Jr., Wilson & Colson, Clarkston, Ga., for Fortenberry Realty Co.

Trammell E. Vickery, Trammell Newton, Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for Harry Norman, Inc. and Harry Norman, Jr.

Harold L. Russell, Thomas W. Rhodes, Gambrell, Russell & Forbes, Atlanta, Ga.,

for Northside Realty, Edwin Isakson, Atlanta Bd. of Realtors, and Georgia Ass'n of Realtors.

Joe H. Bynum, Jr., Lewis & Bynum, Atlanta, Ga., for Clover Realty Co. and Alan B. Jennings.

Frank Strickland, Donald Walton, Skinner, Wilson & Strickland, Atlanta, Ga., for DeKalb Bd. of Realtors, Computerized Multiple Listing Service, Tri-City Realty & Mortg., Bullard Realty, Century 21 Showcase of Homes, Royall-Ackerman, Inc. and Clayton Co. Bd. of Realtors.

Kevin Grady, Jones, Bird & Howell, Atlanta, Ga., for Askew Realty Co., Inc.

J. Al Cochran, Cochran, Camp, Snipes & Davis, Smyrna, Ga., for Jack W. Boone & Co.

Sam G. Dettelbach, Peek & Whaley, Atlanta, Ga., for North Fulton Realty Co.

C. Glenn Stanford, Floyd, Stanford & Hardy, Atlanta, Ga., for Spratlin Associates and Dan Spratlin.

Quinton S. King, Atlanta, Ga., for Cobb Co. Bd. of Realtors, Rockdale Bd. of Realtors and Gwinnett Co. Bd. of Realtors.

John C. Butters, Atlanta, Ga., for First Multiple Listing Service.

Peter Kontio, Peter R. Pendergast, Alston, Miller & Gaines, Atlanta, Ga., for Buckhead Brokers, Inc.

Allen I. Hirsch, Charles L. Gregory, Arnall, Golden & Gregory, Atlanta, Ga., for Adair Realty Co. and Nelson Realty Co., Inc.

Miles J. Alexander, Kilpatrick & Cody, Atlanta, Ga., for Royer Realty Co.

C. David Vaughan, Vaughan, Phears & Murphy, Atlanta, Ga., for Crest Realty and Edward Erbesfield.

## ORDER

VINING, District Judge.

Pending before the court is the plaintiffs' motion to certify their suit as a class action

under Fed.R.Civ.P. 23(b)(3). The plaintiffs, who sold their homes through two of the defendant brokers, contracted to pay a 7% commission on the closing of their respective sales. They now seek to represent all those individuals similarly situated within a circumscribed 19-county area of metropolitan Atlanta.

As set out in paragraph 36 of the amended complaint, the proposed class is defined as follows:

[A]ll persons who have sold residential real estate (excluding sales of new homes or homes sold on behalf of third parties who contracted with employers to dispose of homes of transferred employees) within the greater Atlanta area during the relevant time period [i.e., March 24, 1976, to the date of certification], and, in connection with the sale of such real estate, paid commissions or fees of 7% pursuant to contracts wherein one or more of the Defendant brokers was the listing and/or selling broker.

The defendants consist of numerous brokerage firms, their principals, national franchisors,[1] multiple listing services, and regional real estate boards. They have all been joined in this private antitrust action because of an alleged conspiracy to set and maintain brokerage commissions above the truly competitive level, in violation of section 1 of the Sherman Act. 15 U.S.C. § 1.

The parties have engaged in preliminary discovery on the class certification question. The initial round of briefs generated an evidentiary hearing on February 11, 1982, where both sides presented additional testimony. After the hearing, supplemental briefs were submitted by both sides in an effort to enhance their respective positions.

While mindful of the directive of *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), not to conduct any inquiry into the merits of the plaintiffs' cause of action, the court still must look beyond the pleadings in order to

1. The plaintiffs have represented that all national franchisors will soon be dismissed as parties-defendant.

assess whether the claims, assuming their merit, will satisfy the requirements of Rule 23. *Brown v. Cameron-Brown Co.*, 92 F.R.D. 32 (E.D.Va.1981).

Turning to the express provisions of Rule 23, the court notes that the preliminary requirements of a proposed subsection (b)(3) class are set out as the four criteria of subsection (a), which states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) that there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) representative parties will fairly and adequately protect the interests of the class.

To these criteria there is only passing dispute among the parties.

### 23(a)(1)—Numerosity

Professor Miller, after a review of several hundred class action opinions, offers this observation: "If the class has more than 40 people in it numerosity is satisfied; if the class has less than 25 people in it, numerosity is lacking." A. Miller, "An Overview of Federal Class Actions: Past, Present and Future", monograph, Federal Judicial Center (Dec. 1977).

■ Estimates of the size of the potential class range from the plaintiffs' low projection of 15,000 members to the defendants' upside forecast of 30,000. In either event, the sheer number of the proposed class renders joinder impracticable. This requirement is amply satisfied.

### 23(a)(2)—Commonality

■ This subsection requires that there be a common question of either law or fact running throughout the class. Unlike the (b)(3) requirement, a joining of common issues and claims at this stage is not a determination that classwide issues predominate over individual ones. If there is a common issue, irrespective of whether it is dispositive of the case, this requirement is met.

■■ In general, antitrust plaintiffs are found to have satisfied the (a)(2) element by alleging that a conspiracy, or a monopoly, will be treated as a central or single overriding issue. *See* 7 C. Wright & A. Miller, Federal Practice and Procedure § 1763 (1972). This case is no exception; individual class members have the common obligation of proving the existence and scope of an agreement relating to brokerage fees, and each will be required to show how that agreement constituted an illegal arrangement as defined by the antitrust laws. *See In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322 (E.D.Pa.1976). This requirement is satisfied.

### 23(a)(3)—Typicality

■ A representative's claim is typical of the class if it arises from the same event or practice or course of conduct that gives rise to the claims of the absent class members and if their individual claims are based on the same legal or remedial theory. *Gonzales v. Cassidy*, 574 F.2d 67 (5th Cir. 1973).

■ In this action, the named plaintiffs allege that the defendants agreed to set and maintain non-competitive fees for their services. Davis and Brodhead, as all others, must rely on the elements of conspiracy, impact, and damage in order to recover under the Clayton Act. A disparity in the actual amount of damage each incurred will not undo the typicality of claims already illustrated.

Since all plaintiffs must establish the same basic elements to prevail and since there are no differences as to the type of relief sought or the theories of liabilities upon which plaintiffs are proceeding, the typicality requirement is met. *See In re South Central States Bakery Products*, 86 F.R.D. 407 (M.D.La.1980); *In re Corrugated Container Antitrust Litigation*, 80 F.R.D. 244 (S.D.Tex.1978).

Several courts have required the named plaintiffs to establish their "standing" at this juncture in order to support the typi-

cality element. *See La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1963); *Brown v. Cameron-Brown Co.*, 92 F.R.D. at 38–39.

■ The defendants submit that Davis is not a member of the class he seeks to represent. (No challenge has been issued against Brodhead's membership in the class.) The defendants concede that Davis "signed a listing agreement to sell his house at a 7 percent commission rate." In addition to the sum received at closing, Davis received payments from his buyers for the period of time they occupied the house prior to closing. This payment is viewed as an enhancement of the selling price and a concomitant reduction of the commission rate to 6.94252 percent.

The proof as to this point is inconclusive. There is nothing in the record to show Davis added the "rental" payment to the other amount received in calculating his realized profit or loss. The payment is a related transaction but completely independent from the selling price of the house.

### 23(a)(4)—Representativeness

■ The satisfaction of the representativeness requirement of the rule rests on two criteria, *viz.*, (1) the representative must have common interests with the unnamed members of the class and (2) it must appear that the representative will vigorously prosecute the interests of the class through qualified counsel. *Gonzales*, 474 F.2d at 72. Other than questioning the thoroughness of the plaintiffs' discovery, the defendants have not raised any serious objection to the representatives and their chosen counsel.

The interests of the plaintiffs appear to be properly aligned. All who become class members will be individuals who sold their homes with the assistance of a defendant broker for fees allegedly above the truly competitive rate. Davis and Brodhead have every reason to pursue the absent members' claims to the fullest extent. Moreover, they appear adequately prepared to vigorously prosecute this action. Their counsel have more than a casual familiarity with antitrust and class action litigation, which has been only partially demonstrated by their comprehensive pleadings. *See Eisen v. Carlisle & Jacquelin*, 391 F.2d 555 (2d Cir. 1968).

### 23(b)(3)—Damage Class

If the plaintiffs are to succeed in having their proposed damage class certified, they must also meet the requirements set out in Rule 23(b)(3), which states:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: ... (3) the court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating a litigation of the claims in the particular form; (D) the difficulty is likely to be encountered in the management of a class action.

Predominance, manageability, and superiority are the critical features of this section.

■ The procedural prerequisites of the Rule cannot be applied to this case in isolation. Consideration of the substantive law at issue must be reviewed in conjunction with the certification process in order to ascertain whether the elements of proof are subject to classwide versus individualized analysis. Here, the focal point of the plaintiffs' claim is an alleged violation of section 1 of the Sherman Act, which declares every contract or conspiracy in restraint of trade or commerce to be illegal. 15 U.S.C. § 1. Certain practices, including price fixing, have such a pernicious effect on competition that they are considered to be *per se* violations of section 1. *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309,

316 (5th Cir. 1978). Where price fixing exists, there is no defense or justification for the practice. Nor does the law make an inquiry into the agreement's reasonableness. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980).

■■■ A party seeking to establish civil liability under section 4 of the Clayton Act, 15 U.S.C. § 15, needs to prove more than just a violation of the antitrust laws. Two additional elements, fact of damage (also referred to as impact and causal link) and amount of damage, comprise the essential ingredients of a private action. With respect to impact, proof is similar to the causation element of an action for negligence. Moreover, it is a point which must be proven as a matter of fact and with a fair degree of certainty. *Blue Bird Body Co.*, 573 F.2d at 317; *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307 (5th Cir. 1976). The first two factors—violation and impact—establish liability; the third factor establishes damages.

■■■ In the context of class certification, the focus is on the feasibility of simultaneously proving liability and damages for the 15,000 to 30,000 class members. Where proof is presented that can be justifiably relied upon in a universal fashion, predominance lies in favor of the class.

### Violation

At the February 11, 1982, evidentiary hearing, liaison counsel for the defendants agreed that the first element, the existence of a horizontal price-fixing conspiracy, was a classwide concern susceptible to generalized proof. (For a compendium of cases finding the conspiracy issue predominant see 7A C. Wright & A. Miller, Federal Practice and Procedure, § 1781 (1980 Supp.)). Nevertheless, both liaison and individual counsel have questioned the plaintiffs' ability to establish proof of a conspiracy in a generalized fashion.

■ Included in the record is a proposed list of questions that plaintiffs desire to propound to several of the defendants who are currently embroiled in a parallel criminal action. Quite predictably, all the individuals declined to provide substantive responses and asserted their respective Fifth Amendment privilege against self-incrimination. Unfortunately for all the civil defendants, failure to respond, albeit for good cause, creates an adverse inference against those to whom the questions were submitted. *See Baxter v. Palmigiano*, 425 U.S. 308, 322, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976).

When the negative inferences are coupled with the assumption that the substantive allegations of the pleadings are true, a scenario is produced that is highly suggestive of a conspiracy: sometime in 1975, at least two of the individuals met and agreed to raise the brokerage sales commission for the resale of single family homes from the then prevailing 6% to a 7% rate. Thus for those individuals, the existence of an agreement to manipulate the commissions—a conspiracy—has been sufficiently set out.

The remaining defendants, most notably Crest Realty and Erbesfield, submit that the underlying negative inferences run solely to those exercising their privilege. Consequently, there is nothing in the record to link the rest to the central core group. Efforts to tie the other defendants into the conspiracy and to pinpoint the time of their entry will breakdown the classwide approach required by (b)(3).

■■■ The court is not persuaded by this line of argument submitted by the defendants. An individual's liability in a conspiracy is joint and several spanning the entire life of the conspiracy regardless of when it was joined, limited, perhaps, only by a later withdrawal. Additionally, the defendants' argument fails to examine the issue from the proper perspective. The inquiry is not whether each defendant is conclusively linked to the conspiracy but whether a conspiracy is credibly pleaded. *In re Corrugated Container*, 80 F.R.D. at 250; *Hill v. Art Rice Realty Co.*, 1974–2,

CCH Trade Cases ¶ 75,364 (N.D.Ala.1974). An examination of the record as it now stands clearly shows that events relating to a conspiratorial practice have been suggested which will suffice for class certification purposes.

More important, the scope of the alleged conspiracy is one which is common to the entire class. Each seller will be required to establish this concerted action on the part of the defendants in his or her private action regardless of whether it proceeds on a class basis. The addition or subtraction of plaintiffs does not affect the substance or quantity of evidence which will eventually be offered. In such situations, there is a common question presented. *Blue Bird Body Co.*, 573 F.2d at 322.

### Proof of Damage

■ As to the second element of section 4—impact—the court in *Blue Bird Body Co.*, surveyed the existing precedent relating to this factor in great detail. Of utmost importance in making the determination as to predominance is whether impact will be an issue common to the class and subject to generalized proof, for even if a conspiracy is predominant, that initial conclusion will become unraveled when proof of damage cannot be presented in a general fashion.

■ The court went on to draw a distinction between cases which are particularly amenable to generalized treatment and those which are not. A certain category of price fixing cases is suited for class treatment by virtue of their relative factual simplicity—an unlawful overcharge with respect to a homogenous or fungible product and which was marketed in a similar manner throughout the geographic area is one such type. In this setting, impact and buyer become almost synonymous; therefore, once the illegal overcharge as to the homogenous product has been established, it is most reasonable to assume injury or impact upon a showing of proof of purchase. *Blue Bird Body Co.*, 573 F.2d at 324. *See In re Screws Antitrust Litigation*, 91 F.R.D. 52 (D.Mass.1981); *In re Glassine and Greaseproof Paper Antitrust Litigation*, 88 F.R.D. 302 (E.D.Pa.1980); *In re South Central Bakery Products, supra; In re Corrugated Container Antitrust Litigation, supra*; and *In re Plywood Antitrust Litigation*, 76 F.R.D. 570 (E.D.La.1976). The key question thus presented in this case is whether the real estate services under scrutiny constitute a homogenous product.

Real estate brokers and their ancillary entities have not been uniformly viewed as offering either a standard or a non-fungible service. In *Nichols v. Mobile County Board of Realtors*, 1980–81 CCH Trade Cases ¶ 63,688 (S.D.Ala.1980) (appeal pending), the district court examined the services offered by a broker, the conditions demanded by a seller and characteristics of the house to be sold in concluding that class treatment was not appropriate.

> At the least, the product market is as diverse as the number of real estate brokers in that each real estate broker offers a unique bundle of services to potential home sellers.

Division of the class into sub-classes by broker used was also viewed as unfeasible:

> Because of additional variables which the home sellers and their homes bring to each transaction, however, it is further clear that the "bundle of services" actually sold to one seller may be significantly different from the services sold to another seller, even where the same broker is involved.

*See also Seals v. Nashville Board of Realtors*, 1980–2 CCH Trade Cases ¶ 63,548 (M.D.Tenn.1980), aff'd, No. 80–5454 (6th Cir. April 6, 1982) (net sales percentages vary due to circumstances confronting party at time of closing; realtor may absorb costs or reduce percentages to adjust the asking and offering price); *Dafforn v. Rousseau Associates*, 1976–2 CCH Trade Cases ¶ 61,219 (N.D.Ind.1976) (each realtor provides a unique combination of services and personality; internal cost averaging makes a free market rate impossible to calculate).

Conversely, a number of courts have analyzed the real estate business and concluded

that brokerage firms provide a standard service to all of their customers. These courts emphasize the ultimate end sought by the seller and broker and minimize the means of attaining that end.

> Quite simply, the complaint alleges that the plaintiffs paid commissions a fixed percentage rate higher than they normally would have had the alleged rate-fixing conspiracy not occurred. The individual characteristics of each plaintiff, defendant, and sale would seem to be irrelevant, in that the commission rate charged is the same regardless of the difficulty of the sale.

> *Hughes v. Baird & Warner, Inc.*, 1980–2 CCH Trade Cases ¶ 63,545 at 76,923 (N.D. Ill.1980).

See also In re *Montgomery County Real Estate Antitrust Litigation*, 83 F.R.D. 305 (D.Md.1979); *Voith v. Allardt Gallery of Homes, Inc.*, No. IP 78–147 (S.D.Ind. March 6, 1981) (unpublished).

In this case, the defendants track the points raised in cases where class certification was denied or rescinded. The Atlanta area real estate market is portrayed as too diverse to resort to a classwide finding and conclusion. A broker possesses a large assortment of sale techniques to apply in successfully securing a willing buyer; a seller places an eclectic variety of demands and restraints on the broker's strategy, and each house has particular characteristics which enhance or detract from its salability. Moreover, the initial commission rate often is subjected to adjustment, as the broker tries to reconcile the offering and selling prices. Finally, expenses are frequently incurred by the broker in an effort to sell the property which results in a realized fee less than the one negotiated. As a result of all these factors, the defendants submit that a standard marketwide commission rate is non-existent in the 19-county area.

Oddities and particular quirks that may be part of a transaction will not cancel out the basic purpose of the contractual arrangement entered into by the broker and seller.

> In certifying a plaintiff class, the courts have found it appropriate to look past surface distinctions among the products purchased by class members or the marketing mechanisms involved when allegations of anti-competitive behavior embracing all of the various products and distribution patterns have been credibly pleaded.

> *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y. 1977).

The product or service under scrutiny, when broken down to its bare essentials, is assistance in selling a "used" single family home. For accomplishing that task, the broker charges a fee equivalent to 7% of the purchase price. The agreed upon fee is set irrespective of the number or types of sales techniques applied. And regardless of how much time, energy, or personal expenses are applied or how many prospective buyers are turned away, a broker still charges 7%. The difficulties comprised in the laundry list of items previously set out by the defendants are just costs of doing business.

In sum, for purposes of class certification, the services extended by real estate brokers and their agents are viewed as a single homogenous product.[2] The ultimate end for which a standard fee of 7% of the selling price is charged is the same in each transaction. By treating the real estate trade as providing a standardized product, a court or jury can determine proof of impact in an almost mechanical fashion. As stated in *Blue Bird Body Co.*, when there is uni-

---

2. The court's conclusion that real estate brokers provide a standardized service is reached totally independent from the testimony of Dr. James B. Kau, the plaintiffs' expert. The court agrees with the defendants that Professor Kau has failed to set out any legitimate foundation on which to base his theoretical or applied conclusions. His testimony comes perilously close to the expert testimony rejected in *Nich-*

ols, supra, where the class was decertified. Class representatives in other actions have presented credible expert testimony in their efforts to obtain class certification. See In re *Industrial Gas Antitrust Litigation*, No. 80 C 3479 (N.D.Ill. Dec. 30, 1980) (unpublished); *In re Folding Carton Antitrust Litigation*, 75 F.R.D. 727 (N.D.Ill.1977).

formity in the quality and price of the product, the requirement of impact causes few problems. Given the internal similarity, determination of a truly competitive price will not be too difficult. Furthermore, the showing of proof of damages would be established by proof that the individual consumer paid more than the competitive price. In the instant case, all potential members will have been victimized by the same alleged conspiracy to raise the sales commissions, and the steps for proving impact will be the same for each individual; classwide questions are predominant on the impact.

### Amount of Damages

The third essential prong in this cause of action deals with proof of the amount of damages incurred by each class member. The plaintiffs submit that this determination is simply a matter of subtracting the presumed competitive rate from the alleged inflated price-fixed rate. The defendants, of course, contend that each transaction will have to be individually examined before the precise amount can be established.

While this phase of the action may require individualized treatment, that fact alone is not cause for overriding a determination of class predominance on the liability (violation and impact) stage of a section 4 action. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977); *In re Plywood Antitrust Litigation*, 76 F.R.D. 570 (E.D.La.1976). Moreover, the issue of actual damages, to the extent it becomes individualized, can be bifurcated from the issue common to the class without imperiling the liability finding. *In re Plywood Antitrust Litigation*, 655 F.2d 627, 636 (5th Cir. 1981).

### Manageability and Superiority

In addition to a finding as to predominance of class questions, the court is obligated to find that a class action is superior to other methods of adjudicating the controversy. Here, since the classwide proof of the common questions of violation and impact appears possible, class treatment is clearly superior to any other procedure.

It would not comport with the Rule's concern for fairness and efficiency to have potentially 15,000 to 30,000 actions. This is particularly true where identical proof of the issues would be presented to successive juries. A test case approach is also impractical since each member as part of his or her proof must show the violation and amount of damage. Moreover, the expense involved in a private antitrust case renders individual actions unfeasible, especially where net personal recovery is relatively small. *In re Fine Paper Antitrust Litigation*, 82 F.R.D. 143 (E.D.Pa.1979). For these reasons, class action is clearly the superior course to follow. *See Hedges Enterprises, Inc. v. Continental Group*, 81 F.R.D. 461 (E.D.Pa.1979).

Management of a class of this magnitude is viewed as impossible by the defendants. From their perspective, identification of each member of the class would result in individual mini-trials. Once again, the defendants assert that expenses incurred and adjustments made by the broker to complete a sale constitute a renegotiation of the sales commission. The court has already determined the crucial point to be the gross percentage paid to the broker and not the net realized. Determination of membership may be made from a reading of the documents in the defendants' files. Difficulties in qualifying potential members where documentation does not exist is sheer speculation at this point. Nevertheless, in those yet to be determined number of cases, accommodation can be made if necessary.

This case does not present the kind of difficulties presented in *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974), in that the plaintiffs do not propose a defendant class. Second, the number of transactions is substantially less than the number suggested in *Kline*. And third, the extent of potential vicarious liability does not appear unduly prejudicial.

The Manual for Complex Litigation § 1.43 considers dismissal for management reasons, in view of the public interest involved in class actions, to be the exception rather than the rule. As with all other

cases, there are an unlimited number of alternative means to handle this class action. Denial for management reasons alone would clearly be against all existing precedent.

### Rule 23(c)—Notice

In light of the above findings, the court deems it appropriate to move forward with the next stage of the class action. Rule 23(c)(2) provides:

> In any class action maintained under subdivision (b)(3) the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

The basic method of compiling a list of members to whom notice should be sent has been set out by counsel for the plaintiffs. A more formalized and complete procedure for contacting the class and explaining their rights must be prepared and filed with the court within twenty days of the date of this order. The defendants, again through liaison counsel, will have ten days thereafter to submit any objections or modifications to the proposed process.

### Conclusion

The plaintiffs have satisfied the requirements of Rule 23(a) and (b)(3). Accordingly, the plaintiffs' motion for class certification will be GRANTED and the following class will be certified as requested by the plaintiffs:

> All persons who have sold residential real estate (excluding sales of new homes or homes sold on behalf of third parties who contracted with employers to dispose of homes of transferred employees) within the greater Atlanta area during the period March 24, 1976, to the date of certification, and, in connection with the sale of such real estate, paid commissions or fees of 7% pursuant to contracts wherein one or more of the Defendant brokers was the listing and/or selling broker.

### ORDER

On May 4, 1982, this court certified as a class action under Federal Rule of Civil Procedure 23(b)(3) this case alleging a conspiracy among various real estate defendants to artificially raise and maintain their commissions charged individuals reselling their homes. Less than one week later, the former Fifth Circuit affirmed a district court's decertification of a class in a similarly structured action brought against real estate brokers in Mobile, Alabama. *Nichols v. Mobile Board of Realtors, Inc.,* 675 F.2d 671 (5th Cir. 1982).

The defendants in this action now seek a reconsideration of the class certification order in light of the *Nichols* case.

Although the court of appeals upheld the decertification of the plaintiff's class, it did so solely on the basis that the district court had not abused its discretion. Of more significant concern to the parties in this action is the court's statement of what it was not ruling upon:

> Nor do we hold as a matter of law that real estate brokerage services, by their nature, are nonhomogenous and nonfungible.
>
> *Id.,* at 679.

Clearly, the court was saying that given the proper circumstances, an anti-trust action against the real estate industry may be maintained on a class basis.

The importance of homogeniety in the product or service which is the subject of a price fixing allegation has already been thoroughly set out in the certification order. To capsulize, however, a party pursuing a private action under section 4 of the Clayton Act, 15 U.S.C. § 15, must prove (1) a violation of the anti-trust laws, (2) the fact of damage or impact, and (3) the amount of damage. *Jot-Em-Down Store (JEDS), Inc. v. Cotter & Co.,* 651 F.2d 245 (5th Cir. 1981). In order to convert a personal action into a class action, the representatives must demonstrate that matters common to the class predominate over individual issues. A successful conversion most often occurs where the "impact" element is susceptible to classwide proof. That determination hinges upon the uniformity of the challenged activity or product. This proof of injury in a

price fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supracompetitive prices for [the product or service]. If there was some uniformity in the quality and price of a [product or service] then this requirement of impact might cause few problems." *State of Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 327–28 (5th Cir. 1978).

The class in *Nichols* encompassed all persons who paid a commission or fee to one or more of the defendant real estate companies in connection with the sale of his residential real estate. Those transactions included contracts for commissions ranging from 1% to 12% and flat fees of $25 to $1500. The character of each house and seller influenced which sales techniques would be utilized in marketing the house by the defendant broker. These factors led the court to conclude that there was too complex a product to reduce or handle in a general fashion.

Moreover, the plaintiffs were unable to offer, after two years of preparation, a coherent theory to "show impact as to each member of the plaintiff class without having to resort to lengthy individual examinations." *Blue Bird Body Co.*, 573 F.2d at 328. None of the theories proved viable primarily due to the underlying heterogeniety of the brokers' services. Each transaction would have to be individually examined to determine which bundle of services were selected for that transaction. Since each transaction comprised a unique bundle of services, construction of a truly competitive rate schedule would not obviate the need to examine each transaction within the proposed class to determine what the proper or free market charge would have been.

The court of appeals, after independently evaluating the record, affirmed the trial court's conclusions. The difficulties en-

countered by the *Nichols* class was contrasted with those avoided in *Voith v. Allardt Gallery of Homes, Inc.*, No. IP 78–147–C (S.D.Ind. March 6, 1981); and *Hughes v. Baird & Warner, Inc.*, 1980–2 Trade Cas. ¶ 63,545 (N.D.Ill., 1980). Class membership in *Voith* was restricted to those who contracted and sold their homes for 7%. Showing proof of impact would be accomplished by establishing an estimated rate schedule for brokers' fees that would have prevailed had no anti-trust violations occurred. Impact for each plaintiff then could be shown by a simple comparison between the artificial rate (7%) and the competitive model rate. While in *Hughes*, the court found the defendant brokers charged the same commission regardless of the difficulties encountered in arranging the sale.[1] Tacit approval of these class actions was given by the *Nichols* appellate court.

This court finds the present situation to be more similar to *Voith* and *Hughes* than to *Nichols*. First, by proposing a class which is narrowly constructed to include only those individuals who contracted to pay 7%, analysis of impact for all begins on a common footing. *Compare Voith.* Second, the tendered depositions reflect an intent on the part of some defendants to obtain a 7% commission on all their transactions involving this type of property regardless of the individual idiosyncracies of the components which is an indication of product homogeniety. Third, the plaintiff suggests a theory, by which the question of impact can be answered through a generalized mechanical approach. The plaintiffs intend to prove that in a free market a lower rate would have prevailed. *See Nichols*, 675 F.2d at 679 n.6. Alternatively, they contend the evidence will show a rate lower than 7% prevailed prior to a meeting of several defendants wherein they agreed to

---

1. Further support for the proposition that brokerage services are uniform throughout the market area is found in the recent case *Klein v. Henry S. Miller Residential Services, Inc.*, 94 F.R.D. 651 (S.D.Tex.1982) wherein the court stated:

The Court has carefully reviewed the transcript of the certification hearing and finds that the brokerage services in question are indeed fungible. Real estate brokers perform one basic function and that is providing services for the sale of a home.
At 658.

a uniform increase which was subsequently followed by the remaining brokers.[2]

In conclusion, given the present state of the proceedings, it appears that the plaintiffs have alleged a sufficiently narrow class and proffered an adequate approach as to how the first two elements of this private anti-trust action can be handled in a generalized manner. Accordingly, the defendants' motion for reconsideration and decertification is hereby DENIED.

Pursuant to the court's order of May 4, 1982, the plaintiffs have submitted their detailed proposal by which absent class members could be identified and contacted. To this proposal, the defendants have added their list of modifications and counterproposals dealing exclusively with the communication aspect of the notice proceeding.

Two methods of identification are suggested. The first entails a search of the defendants' transaction files to cull the names and addresses of potential class members. The plaintiffs further suggest that a liaison be named by each defendant in order to facilitate the compilation task. Publication of the notice in the Atlanta Journal/Constitution Sunday edition for three consecutive Sundays is recommended as a secondary means of reaching all the prospective absentees.

The court, after considering the positions of both sides, hereby gives the plaintiffs 60 days from the date of this order to complete their review of the defendants' files. The remaining issues, such as the wording of the notice and the format of the advertisement, are reserved. Finally, the plaintiffs have raised questions concerning the legal sufficiency of proposed counterclaims. Accordingly, they are to submit briefs on the issues within thirty days of the date of this order. The defendants will have 20 days thereafter in which to file their response.

**2.** In *Klein*, there was no difference between the uniform commission rate enforced by the Dallas Board of Realtors from 1958 to 1970 and the alleged collusive overcharge fee existing since 1974. The plaintiff's economist was unable to suggest a method of ascertaining the fee that

would have been charged in a free market environment. Here, the alleged meeting in 1975 creates a watershed between the pre-conspiracy rate of 6% and the post-agreement rate of 7%. The fact of damage could be proven by establishing this historical pattern.